*324 OPINION OF THE COURT
Cooke, J.
We hold that a statement taken in violation of the Miranda rule* may properly be used to impeach a defendant’s credibility where the statement tends to prove a version of the facts contrary to that given in the defendant’s trial testimony.
Late on the night of January 26, 1973, Albert Jenks was shot to death while sitting at a kitchen table in apartment ID, 281 Dumont Avenue, Brooklyn. A preliminary investigation undertaken by Detective John Grosso pointed to defendant Gregory Wise as a prime suspect. Following a more detailed inquiry, Wise was arrested and accused of having committed the murder. At trial, defendant took the stand and related his account of the events transpiring on the night of the fatality. When the shooting occurred, defendant testified, he was in the hallway outside apartment ID, having just departed from another apartment, that of his cousin, in the company of Hank Williams. Seconds before the murder, Williams, who earlier in the evening had brandished a gun in front of defendant, entered apartment ID. By this testimony, defendant suggested that Williams was responsible for the homicide.
On cross-examination, the prosecution sought to question defendant as to statements allegedly made by him at the police station to a Detective Martin. Earlier, these statements had been ruled inadmissible under Miranda. Nonetheless, the Trial Judge, overruling defendant’s objection, permitted the line of questioning to continue:
"Q Did there come a time when you were at the 77th Police Precinct on the 27th of January 1973, that Detective Anthony Martin accompanied you to a men’s room?
"A Possibly.
"Q Did you have a conversation with him?
"A Not that I can remember.
* * *
"Q Did he say to you words to this effect, 'How could a guy like yourself, a Vietnam Vet, get involved in something like this?’
* * *
"Q And did you answer that question?
* * *
*325 "Q Did you say to him, 'I don’t know, the gun must have had a hair trigger. It went off accidentally, or it just went off —words to that effect?
"A No.
"Q You deny that; you deny saying that?
"A Yes, sir.”
To rebut the defendant’s denial, the People called Detective Martin as a witness. Martin stated that defendant had in fact made the "hair trigger” remark attributed to him by the District Attorney. After the officer left the stand, the court charged the jury that his testimony was to be considered only on the issue of defendant’s credibility. Subsequently, the jury convicted defendant of the murder.
Finding the cross-examination of defendant and the rebuttal testimony of Martin improper, a divided Appellate Division reversed the conviction and ordered a new trial. In substance, the majority reasoned that, since defendant’s direct testimony "virtually excluded all reference to Detective Martin” (60 AD2d, at p 922), it was error to allow cross-examination concerning statements made to the officer. As to the rebuttal evidence given by Martin, the Appellate Division concluded that the "hair trigger” cross-examination was collateral and that therefore defendant’s answers were not subject to contradiction by the People. We disagree with both branches of this analysis.
. [1, 2] The rules governing impeachment of witnesses are deeply rooted in our adversary system. That system, premised upon a "bi-partisan presentation” of evidence in judicial proceedings, provided the impetus for the development of techniques whereby a party could test the credibility of his opponent’s witnesses (see, e.g., 3 Wigmore, Evidence [3d ed], § 875). Credibility is a many faceted concept, of course, requiring a careful assessment of a number of subtle factors before testimony can be labeled as believable or unbelievable (seé McCormick, Evidence [2d ed], § 33, p 66, n 1). While it might be accurate to say that no one factor predominates, there are two fundamental considerations in evaluating whether a particular witness is speaking the truth: the honesty of the witness, and his ability to recall details. Especially adapted to test these important characteristics is the device commonly refer *326 red to as impeachment by "prior inconsistent statement” (see 3 Wigmore, Evidence [3d ed], § 1017, p 685).
 The law pertaining to prior inconsistent statements is well developed, having originated at early common law (see, e.g., Langhorn’s Trial, 7 How St Tr 451, 462) and having been refined over the intervening decades (see, e.g., People v Bornholdt, 33 NY2d 75, 88-89). Thus, the elements of the rule are easily stated: "If a proper foundation is laid, a party may show that one of his adversary’s witnesses has, on another occasion, made statements which are inconsistent with some material part of his present testimony” (Richardson, Evidence [10th ed — Prince], § 501, p 486). To set the stage for the prior inconsistency, the questioner must first inform the witness of the circumstances surrounding the making of the statement, and inquire of him whether he in fact made it (e.g., Larkin v Nassau Elec. R. R. Co., 205 NY 267, 269; see 3 Wigmore, Evidence [3d ed],» §§ 1025-1029; McCormick, Evidence [3d ed], § 37). Once properly admitted, the previous statement traditionally might be used only to affect credibility (e.g., Richardson, Evidence [10th ed — Prince], § 501, pp 486-487), but under a modern view of the hearsay rule adopted by some authorities it is admissible as evidence in chief (e.g., McCormick, Evidence [2d ed], § 251; 3 Wigmore, Evidence [3d ed], § 1018, pp 687-688; contra CPL 60.35, subd 2).
Primarily at issue here is whether defendant’s previous utterance was sufficiently inconsistent with his trial testimony to warrant its use on cross-examination. From earliest common-law days, a prior statement was admissible for impeachment purposes even though it did not directly contradict the witness’ testimony (e.g., Foster v Worthing, 146 Mass 607; 3 Wigmore, Evidence [3d ed], § 1040). Our case law accords with this established precept. In Larkin v Nassau Elec. R. R. Co. (205 NY 267, 269, supra), for example, we emphasized: "Nor need there be a direct and positive contradiction. It is enough that the testimony and the statements are inconsistent and tend to prove differing facts.” More recent cases, too, reiterate and apply the rule in this fashion (e.g., People v Bornholdt, 33 NY2d 75, 88, supra; see People v Miles, 23 NY2d 527, 543-544, cert den 395 US 948; People v Johnson, 27 NY2d 119, 122-123, cert den 401 US 966). Indeed, a more rigorous rule requiring direct contradiction would be at odds with the purpose underlying use of prior inconsistents, since such statements are admitted principally to assist the jury in its fact-finding role *327 (e.g., McCormick, Evidence [2d ed], p 69). In case of doubt, therefore, the balance should be struck in favor of admissibility, leaving to the jury the function of determining what weight should be assigned the impeachment evidence. Applied in this fashion, the law of previous contradictory statements will advance rather than impede the truth-seeking process.
Measured against these standards, the cross-examination of defendant was proper. Upon taking the stand, defendant recited a detailed account of his activities on the night of the shooting. Included were statements to the effect that he was in the hallway and not in apartment ID at the time of the incident, and that he observed Williams handling the gun soon after it was fired. Standing in stark contrast to this testimony is defendant’s "hair trigger” remark. That prior utterance tends to prove that defendant was present in the room when the decedent was killed and that defendant rather than Williams possessed and discharged the weapon. Although the "hair trigger” statement may not directly conflict with defendant’s trial testimony, it does tend to establish a differing version of the facts. Under seasoned impeachment principles, then, defendant’s comment was properly used to affect his credibility.
Relying upon Agnello v United States (269 US 20) and People v Rahming (26 NY2d 411), defendant nonetheless contends that since he did not testify as to the conversation with Officer Martin, he did not "open the door” to cross-examination concerning statements made during that conversation. Nothing contained in these cases, however, detracts from our analysis. True, defendant by his direct testimony must "open the door” to impeachment; otherwise such cross-examination would be impermissible (People v Rahming, 26 NY2d 411, 418, supra; People v Miles, 23 NY2d 527, 542-545, supra). But this is merely another way of saying that there must be an inconsistency between the trial testimony and the previous statement. Defendant need not testify with respect to the conversation to create such a contradiction. So long as defendant recounts the events to which the prior inconsistent statement relates, he has opened the door to impeachment (e.g., People v Miles, supra, at pp 543-544; People v Johnson, 27 NY2d 119, 122-123, supra). Simply put, where a defendant’s trial testimony offers one version of the events in question, and his prior remark to a police officer suggests a contrary *328 view of those events, the jury is entitled to hear the previous statement so that it may fully assess the witness’ credibility.
We likewise find no error in the introduction of the rebuttal testimony of Detective Martin, admitted after defendant denied making the "hair trigger” comment. As a general rule, the prosecution is not bound by defendant’s answer to a question designed to test his credibility, unless the inquiry concerns a matter deemed collateral to the case (People v Schwartzman, 24 NY2d 241, 246, cert den 396 US 846; People v Sorge, 301 NY 198, 201; Wells v Kelsey, 37 NY 143; 3 Wigmore, Evidence [3d ed], §§ 1003, 1021; Richardson, Evidence [10th ed — Prince], § 491). Evidence is not collateral, however, when it is relevant to some issue other than credibility (People v Schwartzman, supra, at p 245; 3 Wigmore, Evidence [3d ed], § 1020; Richardson, Evidence [10th ed— Prince], § 491). The obvious and salutary purpose of this rule is to prevent needless multiplication of issues in a case so as not to confuse the jury.
Accordingly, here not only could the statement made by defendant to Detective Martin be used for purposes of cross-examination of defendant while he was on the stand, as in People v Harris (25 NY2d 175, affd 401 US 222), but the statement itself was properly introduced through Detective Martin in rebuttal. Inasmuch as the content of the statement was relevant to issues otherwise before the jury, its introduction did not expose the jury to the risk of diversionary excursion into collateral matters. But for the Miranda violation, the prosecution could have used the remark on its direct case as tending to establish defendant’s complicity in the crime. The jury was, of course, instructed that the statement was not to be considered on the merits but only on the issue of defendant’s credibility. As to such issue it was of significant value, tending to impeach not alone defendant’s general credibility but particularly his credibility with respect to the very issues he had asked the jury to resolve. Viewed from this perspective, the introduction of the statement in rebuttal was not error.
 Inasmuch as the cross-examination of defendant and the rebuttal testimony of Officer Martin were proper, as gauged by familiar rules of evidence, the instant proceedings were not beset by error of a constitutional dimension. It has previously been established that statements elicited in violation of Miranda, although not admissible on the prosecution’s *329 case in chief, may nonetheless be used to impeach the defendant’s credibility (People v Harris, 25 NY2d 175, affd 401 US 222, supra). Once a particular statement is found appropriate for impeachment purposes, any Miranda infirmity becomes irrelevant (see Oregon v Hass, 420 US 714). In the present case, therefore, defendant Wise’s Miranda rights were not impaired.
Defendant urges another and unrelated ground as justifying the Appellate Division’s reversal of the conviction. During trial, Detective Grosso, the officer heading the murder investigation, testified as to incriminating remarks made by defendant during custodial detention. While these statements were found to be voluntarily made in full compliance with Miranda, defendant now argues they were the fruit of illegal police conduct and hence inadmissible as evidence. Mounting a two-pronged attack, defendant contends that the police had no predicate for taking him into custody and, more important, that the suppression court refused to allow exploration of the legality of the detention.
We agree with defendant insofar as he asserts it was incumbent upon the suppression court to permit an inquiry into the propriety of the police conduct. That the People bear the burden of going forward to justify police activity, such as an arrest or a custodial interrogation, once it is challenged by defendant is too basic to dispute (People v Baldwin, 25 NY2d 66, 70-71; People v Malinsky, 15 NY2d 86, 91). Ordinarily, where the defendant is denied an opportunity at the suppression hearing to delve into the circumstances attendant upon his arrest or detention, his motion to suppress would be favorably entertained on appeal (cf. People v Baldwin, supra, at pp 70-71). Especially would this be so when the District Attorney has not established, prima facie, that the police acted upon probable cause or reasonable suspicion, as the case may require. Confronted by such a failure of proof, an appellate court might be unable to remit for new or supplementary proceedings (cf. People v Havelka, 45 NY2d 636). Thus, noncompliance with the procedural devices designed to afford the defendant an opportunity to be heard might well result in suppression of evidence which otherwise could be properly admitted.
Here, however, defendant simply was not prejudiced by the erroneous ruling. Irrefutable evidence offered at the suppression hearing demonstrates that Detective Grosso had knowl *330 edge of defendant’s presence at the murder scene prior to any custodial interrogation. Having spoken with Ennette Holliman, an eyewitness to the happenings in apartment ID, as established during cross-examination, Grosso possessed information as to the nature and extent of defendant’s involvement. Indeed, the officer stated during the hearing that he had received such information, and, buttressing this testimony, Holliman related at trial that she had recounted to Grosso the events of the 26th. These statements of an eyewitness placing defendant at the scene of the crime were sufficient to form the basis for a custodial detention (see, e.g., People v Morales, 42 NY2d 129, 135-136). So long as the police are solicitous of an individual’s rights, and carefully delimit the scope of the intrusion, a custodial detention predicated upon reasonable suspicion can hardly be termed "unreasonable” (People v Morales, supra). On this record, therefore, defendant’s pretrial suppression motion was correctly denied.
Accordingly, reversal is required. Inasmuch as the Appellate Division determination was based solely upon the law, without any indication as to whether the facts were considered (CPL 470.25, subd 2, par [d]), there must be a remittal for a review of the facts (CPL 470.40, subd 2, par [b]).
For the reasons stated, the order of the Appellate Division should be reversed, and the matter is remitted to that court for a review of the facts.

 (Miranda v Arizona, 384 US 436.)