**Jose LABOY, Petitioner,**

v.

**Joseph A. DEMSKIE, Acting Superintendent, Woodbourne Correctional Facility, Respondent.**

**No. 96 Civ. 2890 (RWS).**

United States District Court,
S.D. New York.

Nov. 29, 1996.

Office of the Appellate Defender, New York City (Richard M. Greenberg, of counsel), for petitioner.

Robert R. Johnson, District Attorney, Bronx County, New York City (Peter D. Coddington, Karen Swiger, of counsel), for respondent.

## OPINION

SWEET, District Judge.

Petitioner Jose Laboy ("Laboy") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, filed on April 23, 1996, Laboy contends that the state conviction must be set aside because the trial court improperly limited his cross-examination of government witnesses thereby violating his Sixth Amendment right to confrontation and his Due process right to present his defense. For the reasons set forth below, his petition will be denied.

### The Parties

Laboy is currently confined at Woodbourne Correctional Facility (the "Facility"), New York, pursuant to a judgment of conviction of the Supreme Court of Bronx County.

Respondent Joseph Demskie ("Demskie" or "the State") is the Superintendent of the Facility. Pursuant to an agreement between the Office of the Attorney General of the State of New York and the Office of the District Attorney of Bronx County, the Bronx District Attorney (the "District Attorney") represents Demskie.

### Prior Proceedings

On October 23, 1992, Laboy was convicted of manslaughter in the first degree after a jury trial, and he was sentenced on November 17, 1992 to an indeterminate prison term of eight and one-third to twenty-four years. On March 22, 1994, the Appellate Division, First Department, affirmed the conviction in a brief opinion, and on July 6, 1994, leave to appeal that decision to the New York Court of Appeals was denied.

## The Facts

### I. Background

Shortly after midnight on June 13, 1991, Augustine Anthony Arragones ("Arragones") and his live-in girlfriend of five years, Ronalda Blount ("Blount"), walked from their residence to the Patterson Housing Project in the Bronx to purchase crack cocaine. While on a pathway outside the Patterson Housing Project, Arragones was shot once in his left armpit area while Blount sat on a bench approximately twenty feet away from Arragones. After he was shot, Arragones ran towards where Blount was sitting, collapsed, and died. Police arrived shortly thereafter.

In the hours following the shooting, Blount spoke with police five times.[1] According to Detective Taliaferro's Unusual Occurrence Report, Blount first described seeing a young black man wearing a gray sweatshirt approach her and Arragones on the pathway outside Patterson Housing Project; Blount told Detective Taliaferro that while Arragones talked with this man, she walked to and sat on a nearby bench. According to the report, Blount stated that while she sat on the bench paying no attention to Arragones, she heard a noise like a firecracker and saw out of the corner of her eye a person running towards her; then, she saw it was Arragones. Blount also described a second black man who approached her bench to retrieve what she assumed was crack cocaine from a bag on the bench; Blount stated that this second black man started to walk toward Arragones just prior to the shooting. However, Blount never placed Laboy or a person fitting Laboy's description on the scene in her first four interviews with the police.

In her fifth interview with police, approximately eighteen hours after the shooting, Blount for the first time identified Laboy as being present on the scene along with the two black men she had already described. Blount told Detective Tebbens that she saw Laboy stand next to Arragones, put his right arm around Arragones, and place a black object against Arragones' left side as she heard a "bang" or firecracker noise. Blount also informed the detectives that she had known Laboy for approximately six months.

Based on Blount's statement, the police on June 15, 1991 brought Laboy to the 48th Precinct Station House to conduct a line-up. After Blount identified Laboy in the line up, Laboy was arrested for the shooting of Arragones.

### II. The Trial

Laboy was charged with murder in the second degree and manslaughter in the first degree. The state's case against Laboy rested primarily on Blount's eyewitness testimony. Consequently, the main issue at trial was Blount's identification of Laboy as the perpetrator, and Laboy's sole defense consisted of attacking the credibility of Blount's testimony. The state also presented forensic evidence that corroborated Blount's testimony that Arragones was shot in the left armpit. While this does not corroborate Blount's identification of Laboy as the perpetrator, it does corroborate Blount's account of the shooting.

On direct examination, Blount testified that other individuals, in addition to Laboy, were in the vicinity of Arragones around the time of the shooting. Tr. at 28. Moreover, Blount admitted that she failed to mention Laboy and his role in the shooting to police in her initial statements, but she explained she didn't describe Laboy because she was "scared and ... didn't know what was going to happen next." Tr. at 32.

On cross-examination, Laboy was permitted to elicit from both Blount and Officer Tebbens that Blount failed to mention Laboy in her first four statements to police. Tr. at 79–83, 327–28. Laboy was also permitted to elicit from Blount a description of the black

---

1. While at the crime scene, Blount spoke twice with the police. At approximately 12:20 a.m., she spoke with Officer Monahan and Sergeant Lieber, and at approximately 1 a.m., she spoke with Detective Tebbens. Blount then went to the 40th Precinct and spoke twice more with police before returning home at approximately 6 a.m.; she spoke with Detectives Taliaferro and Lappe at approximately 2 a.m., and at approximately 4 a.m., she spoke with Detective Tebbens again. In the late afternoon of July 13, 1991, Detective Tebbens asked Blount to return to the precinct, and at approximately 6 p.m., she spoke with Detectives Tebbens and Beckel at the precinct.

male who first spoke with Arragones. Tr. at 90–91. Laboy also successfully impeached Blount's testimony in several other areas. For example, Laboy successfully elicited from Blount that she smoked crack cocaine twice during the week of the shooting, Tr. at 57, that she and Arragones were at the Patterson Housing Project to purchase crack cocaine, Tr. at 58, and that her view of Arragones of the time of the shooting was briefly obstructed, Tr. at 128. Furthermore, on direct examination, Blount admitted that she had smoked crack cocaine approximately five to six hours before the shooting. Tr. at 31.

However, the trial court did not permit Laboy to elicit information about Blount's prior statements to police in which she stated that an unidentified black man wearing a gray sweatshirt was speaking to the victim immediately prior to the shooting, but did not include Laboy in her narrative of events.[2]

The trial court heard argument outside of the presence of the jury on the admissibility of the prior statements. Defense counsel argued that Blount's initial statements to police were inconsistent not only because she failed to place Laboy on the scene, but because she also arguably implicated the unidentified black man as the shooter; by placing this individual alone with the victim, Blount's statement may suggest that this individual was the shooter. However, the trial court concluded that this argument was "ludicrous" and "misleading." [3]

2. The Court sustained numerous objections to Laboy's attempts to elicit from Blount her description of the young black man in her earlier statements to police and the fact that she placed this individual, and not Laboy, on the scene. For example:

Q: Do you remember speaking to detectives at that time. Correct?
A: Yes.
Q: And you remember giving them information regarding what happened? Correct?
A: Yes.
Q: And they asked you for a description. Correct?
Mr. Hirsch (State): Objection as to foundation.
The Court: Sustained.

Tr. at 67.

Q: Did there come a time when you gave a description to Detective Taliaferro of an individual at that location?
Mr. Hirsch: Objection.
The Court: You have to—I'm not going to allow the question the way it stands. If you want to ask was the person Tony was talking to prior to him, you may ask that question.
Q: When you spoke with Detective Taliaferro, did you make any mention shown [sic] to Detective Taliaferro of Jose [Laboy]?
A: No. At that point, I did not.
Q: Thank you. When you spoke with Detective Taliaferro and he asked you how many individuals were at that location, did you give them a response to that question?
Mr. Hirsch: Objection.
The Court: Sustained.

Tr. at 69.

Q: When you spoke with Detective Taliaferro, did you tell him how many individuals spoke with Tony indictment [sic]?
Mr. Hirsch: Objection.
The Court: Sustained.
Q: When you spoke with Detective Taliaferro, did you tell him that more than one individual spoke with Tony.

Mr. Hirsch: Objection.
Ms. Ruiz: May I just finish my question?
The Court: Sustained.
Ms. Ruiz: May we have a side bar, please?
The Court: No.

Tr. at 70–71.

Q: And there came a point in time when Detective Tebbens asked you questions regarding whom Tony was talking to, correct?
A: Yes.
Q: And there came a point in time when he asked you who he was talking to, that you told him that it was a male Black, correct?
Mr. Hirsch: Objection.
The Court: Sustained.
Mr. Hirsch: Judge, I'm going to ask to approach. We have had this already.
The Court: Sustained.
Q: Now, you did talk to Detective Tebbins about Tony speaking with someone, correct?
The Court: Sustained. Sustained. You asked it six times now, and you asked it in the morning. You have asked it in the afternoon. she said it. It's in the record.

Tr. at 94–95.

3. The Court: Look. It is clear. It is crystal clear in her testimony. She said before she never mentions Jose Laboy; that, the deceased had a conversation with a person, not the shooter, underline, not the shooter, and in this DD5, she gives a description of a male Black, 5–8, medium build, brown skin, gray sweat shirt. It's also crystal clear, she never mentioned Jose, she never said who the shooter was. You cannot mislead the jury by trying to say—this is what you were trying to do. This is a description of the perpetrator, the shooter, which you know full well, is not, and I find this almost—I find thus [sic] unethical behavior. One.
Two: Ask her, did she ever say who the shooter was, and she already said that, no, I never mentioned Jose. So, anything else you're do-

Note 3—Continued

ing, I think is purposefully misleading the jury. Everything else is consistent. So, I really don't know what you're doing, and I think that it's totally improper. . . .

Now, that's my ruling. What is it that you want to say now?

Ms. Ruiz: Judge, when this particular report, the impression that is left with the person taking down the information, she's asked—she gives a description of a male Black, approximately 20 years old, et cetera—

The Court: Oh, my God. Miss Ruiz, don't persist in this argument. It is totally—it is outrageous. It is a ludicrous argument.

Ms. Ruiz: It is an inconsistent statement from later statements, Judge. She says here that while he was talking, the decedent was talking to this male Black. That there came a time when she sat down on a bench a few feet away from where they were talking. They were talking—that she heard a firecracker,—that she heard a firecracker, and then saw the decedent running towards her.

The Court: What is it that's inconsistent?

Ms. Ruiz: With later that she gives to the—

The Court: Which is what? Which are what?

Ms. Ruiz: From one person at the—

The Court: You know, you are purposefully distorting this. I can't believe you're doing this. On her direct testimony she says that Tony talked to some other person. THen [sic] she said she saw Jose, and se [sic] proceeds to say what happened. Is that what her direct is, Mr. Hirsch?

Mr. Hirsch: That's my recollection.

The Court: Is this male Black described here, the shooter, suppose to be the shooter?

Mr. Hirsch: That is not how I read the statement, Judge. It's our position is [sic] the impeachment is complete. It's admitted that she didn't say Tony [sic] in there, and the impeachment is done now.

The Court: And she even said on one of her answers, who are you asking me the description for. If you want to lay a foundation and say, did you give a description of the other person that Tony was talking to I suppose you can ask her, although it's not impeachment; because, no one ever asked her a description on that.

Mr. Hirsch: I will object on the grounds of hearsay. It is not inconsistent.

Ms. Ruiz: Just because Mr. Hirsch doesn't ask for a description doesn't mean that I can't ask her.

The Court: But he is not the shooter.

Ms. Ruiz: We don't know that. In this particular report, from what I gather, that is the shooter, Judge. she [sic] says that he goes to talk with this guy. she [sic] sits on a bench.

The Court: I will not allow this. she [sic] said she saw another person.

Ms. Ruiz: She hears a firecracker, and then she sees Jose. She says nothing about Jose in this. she says nothing about any other individual standing next to Tony.

The Court: Ask her if she mentioned Jose or another individual talking to Tony. You can't

use a description to show that's a description the she gave, as the shooter. She never said who the shooter was in that initial statement. . . . That's my ruling. I suggest that you abide by it. If you want to ask her to describe this other individual, I will allow that. Not by impeachment. Just ask her what this other person looked like. If you want to do that, you can

Tr. at 72–78.

The Court: And there is no way that any police report which I perused and read myself could be interpreted that the male black was the shooter. In contrast, you can't have it both ways, Miss Ruiz. You're saying that she didn't mention the shooter in her first set of statements. So I allowed you. She didn't say who the shooter was at all. It's absent. It's blank. There is nothing in her narrative about seeing the shooter. So I allowed that to come out as a material omission. In contrast, you can't have these male blacks who she did describe.

Ms. Ruiz: But the impression that is left from this report, Judge and this is something that the jurors should be allowed to consider. When she first spoke to Detective Taliaferro.

The Court: First of all, they're out of court statements. They are hearsay. If you want to argue to the jury, I think there is enough in this record to say it was not—you could argue there are two other people there . . .

.   .   .   .   .

Ms. Ruiz: It's inconsistent. It's a prior inconsistent statement. There is no getting around the fact that she mention to the cop that the only person she sees talking to my client—to the decedent is this young male black.

The Court: You want me to do your summation for you? So you say, look ladies and gentlemen of the jury, she speaks to the officer. She mentions one person, a male black, who talked to the deceased. Argue whatever you want from that. It's in the record.

.   .   .   .   .

Mr. Hirsch: There is nothing in that report other than that patent omission of Jose's name which was brought out and should have been brought out and was replied to and admitted to by Miss Blount that's inconsistent. Anything else in that report is not inconsistent and with all due respect to counsel my interpretation of that report differs from her's. Clearly, she is not giving a description of the shooter.

The Court: Correct.

Mr. Hirsch: She gives no description of the shooter.

The Court: Any person who can read and write English can use that report to say that that was not the description of the shooter. She totally neglects to say how the shooting occurred in that initial statement and she names no one. That is a description. This is the last time I am going to say that of that same first person who she did not know who Tony spoke to was they enter the pathway at 414 Morris Avenue.

The trial court found that there was no inconsistency in Blount's statements to police with respect to this black man because all of Blount's statements to police include his presence on the scene; consequently, the court reasoned, testimony about the prior statements referring to this individual was inadmissible hearsay. Although the trial court permitted defense counsel to elicit a description of the unidentified black man, it did not permit defense counsel to attempt to impeach Blount in this area. The only foundation question which the trial court would have permitted defense counsel to ask was whether Blount identified the black man as the shooter to police. Tr. at 251; *see* Tr. at 221, 372. Defense counsel did not ask Blount that question.

Police officers who interviewed Blount after the shooting also testified. However, because defense counsel did not lay the foundation required by the trial court with respect to Blount's inconsistent statement about the black man, defense counsel was not permitted to ask these police officers about Blount's statements about the unidentified black man.

In closing arguments, defense counsel aggressively attacked Blount's credibility. Defense counsel argued that Blount's perception of events was questionable because, among other things, she had smoked crack cocaine approximately five hours prior to the shooting, Tr. at 427, 433, her view was obstructed around the time of the shooting, Tr. at 437, and she may have been distracted by the large number of people in the vicinity at that time, *see* Tr. at 419. Defense counsel also argued that Blount's testimony simply was not credible because Blount "lied by omission at least four times" when she failed to identify Laboy to police in her earlier statements. Tr. at 424. Defense counsel also suggested that another person shot Arragones and that Blount, in fear of this shooter, accused Laboy. Tr. at 426. However, defense counsel never argued that Blount's prior statements to police were inconsistent because they suggested that somebody other than Laboy shot Arragones.

After asking to have Blount's testimony reread three times, the jury found Laboy guilty of manslaughter in the first degree. Laboy appealed his judgment of conviction in the New York state courts raising all the grounds presented in the instant petition.

### Discussion

### I. The Habeas Corpus Provisions of the Antiterrorism and Effective Death Penalty Act of 1996 Do Not Bar Consideration of Laboy's Petition

On April 24, 1996, President Clinton signed into law the "Antiterrorism and Effective Death Penalty Act of 1996" (hereinafter "the Act"), Public Law 104–132, which imposes new restrictions on habeas corpus petitions. Section 101 of the Act amends 28 U.S.C. § 2244 to require that habeas corpus petitions brought under 28 U.S.C. § 2254 be filed not later than one year after the completion of state court direct review.

Because Laboy filed his petition on April 23, 1996, more than one year after leave to appeal to the Court of Appeals was denied on July 6, 1994, the state contends that Laboy's petition is time-barred. However, the Second Circuit has held that the Act does not apply retroactively to petitions filed before the Act took effect. *See Reyes v. Keane,* 90 F.3d 676, 679 (2d Cir.1996) (holding that the Act's new statute of limitations does not apply to pending cases); *Boria v. Keane,* 90 F.3d 36, 38 (2d Cir.1996) (holding that the Act's new standard of review does not apply to pending cases). Consequently, the Act does not divest this Court of jurisdiction over Laboy's petition, which was filed before the Act took effect.

### II. Laboy's Sixth Amendment Claim

Laboy contends that the state trial court denied him his Sixth Amendment right to confront witnesses against him by refusing to permit petitioner to impeach the complaining witness with respect to allegedly inconsistent prior statements she made to police officers investigating the shooting. Laboy also contends that the trial court deprived him of his

---

That's the only reading of that. That's the only fair reading of that report. Anything else would be to purposefully mislead the jury and distort the case.
Tr. at 206–09.

right to confrontation by barring defense counsel from cross-examining the police officers about these statements.

### A. The Sixth Amendment Right of Confrontation

The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, *see Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), guarantees the defendant in a criminal prosecution the right to confront witnesses against him. *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986). " 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' " *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, Evidence s. 1395, p. 123 (3d ed. 1940)); *see Van Arsdall,* 475 U.S. at 678, 106 S.Ct. at 1434–35; *Woods v. Kuhlmann,* 677 F.Supp. 1302, 1306 (S.D.N.Y.1988).

"[T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but [also] .... allowed to impeach, *i.e.,* discredit, the witness." *Davis,* 415 U.S. at 316, 94 S.Ct. at 1110. The Confrontation Clause of the Sixth Amendment generally requires that the defendant in a criminal prosecution be afforded wide latitude in cross-examining government witnesses. *United States v. Weiss,* 930 F.2d 185, 197 (2d Cir.), *cert. denied,* 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991); *United States v. Pedroza,* 750 F.2d 187, 195 (2d Cir.1984).

However, the Confrontation Clause generally guarantees only "an *opportunity* for effective cross-examination," *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (emphasis in the original) (citing *Ohio v. Roberts,* 448 U.S. 56, 73 n. 12, 100 S.Ct. 2531, 2543 n. 12, 65 L.Ed.2d 597 (1980)). It does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 20, 106 S.Ct. at 294. Instead, the trial court retains "wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435; *see Jones v. Berry,* 880 F.2d 670, 673 (2d Cir.1989).

### B. Refusal to Permit Impeachment was Evidentiary Error

█ In the instant case, the trial court did not permit Laboy to cross-examine Blount about her allegedly inconsistent prior statements to the police. The trial judge ruled that Laboy had failed to lay a proper foundation to inquire into a prior inconsistent statement. Also, the trial judge thought that Blount's statements to police with respect to this black man were not inconsistent, because not only did all of Blount's statements to the police include the presence of this black man, but Blount also never explicitly identified this black man to be the "shooter" in her initial statements. Furthermore, the trial judge found that this avenue of inquiry was misleading and improper.[4]

The trial court's evidentiary rulings were erroneous. Blount's initial statements to the police were inconsistent with her final statement, in which she implicated Laboy in the shooting.

█ Under New York law, a defendant in a criminal proceeding has the right to cross-examine a witness over his or her omission of a material fact in earlier statements as a prior inconsistent statement. *See People v. Savage,* 50 N.Y.2d 673, 679, 431 N.Y.S.2d 382, 384, 409 N.E.2d 858, 861 (1980) ("[W]hen given circumstances make it most unnatural to omit certain information from a statement, the fact of the omission is itself admissible for purposes of impeachment."); *see also Chesney v. Robinson,* 403 F.Supp. 306, 310 (D.Conn.1975), *aff'd,* 538 F.2d 308 (2d Cir. 1976) ("[A] failure to testify to a fact which would naturally have been mentioned is legally as inconsistent as a specific prior state-

---

4. Because the trial judge did not believe that this black man was the shooter, she informed defense counsel that inquiry along those lines was misleading, improper, and unethical. Tr. at 768.

ment to the opposite effect.") (citing McCormick, Evidence § 34 (2d Ed.1973)).

Moreover, a prior statement need not directly and positively contradict a witness' testimony to be admissible for impeachment purposes. *People v. Wise*, 46 N.Y.S.2d 321, 326, 413 N.Y.S.2d 334, 336–37, 385 N.E.2d 1262, 1265 (1978). So long as the witness's trial testimony and the prior statement "are inconsistent and tend to prove differing facts," the prior statement is admissible for impeachment purposes. *Id.* at 326, 413 N.Y.S.2d at 337, 385 N.E.2d at 1265 (quoting *Larkin v. Nassau Elec. R.R.*, 205 N.Y. 267, 269, 98 N.E. 465, 466 (1912)). "In case of doubt, . . . the balance should be struck in favor of admissibility, leaving to the jury the function of determining what weight should be assigned the impeachment evidence." *Id.* at 327, 413 N.Y.S.2d at 337, 385 N.E.2d at 1265.

Although the trial court permitted Laboy to cross-examine Blount about the fact that she did not mention Laboy in her prior statements to the police, the trial court did not permit Laboy to elicit from Blount that her earlier statements to police "tend to prove differing facts" from her last statement and testimony implicating Laboy. Specifically, Blount's earlier statements tend to implicate another individual as the shooter: the black man who spoke with Arragones.

This inconsistency between Blount's prior statements and her testimony may have been more potent as impeachment than the fact that Blount did not identify Laboy in her first four statements. Not only did Blount fail to identify Laboy in her earlier statements, but she presented a coherent narrative that arguably implicated another individual. Even if Blount never explicitly identified this black man as the "shooter" in her earlier statements to the police, the police reports support the argument that Blount's earlier statements may be reasonably interpreted to implicate the black man as the perpetrator, since the noise like a firecracker was heard by Blount shortly after the black man's appearance on the scene.

The trial judge also determined that the exclusion of the prior statement was appropriate because the argument that Blount's

prior statements to police implicated another individual as the perpetrator was "misleading" and "ludicrous." Tr. at 72–75. The First Department held that the trial judge's preclusion of impeachment was "an appropriate exercise of discretion" since "the details of [the prior statements] were uncertain and susceptible to distortion." *People v. Laboy*, 202 A.D.2d 325, 325, 609 N.Y.S.2d 211, 212 (1st Dept.), *app'l denied*, 83 N.Y.2d 1005, 616 N.Y.S.2d 486, 640 N.E.2d 154 (1994).

However, because this avenue of inquiry is proper impeachment by prior inconsistent statements, it is neither misleading nor improper. Proper impeachment, if effective, casts doubt on the witness' sincerity, perception, memory, or characterization of events. While this may "distort" the prosecution's simple version of events, it is not "misleading" to impeach a witness' credibility with that witness' inconsistent statements.

Furthermore, because one may reasonably infer from Blount's prior statements to police that she implicated a black man as the perpetrator, this inference is neither "misleading" nor "ludicrous." Although it is true, as the First Department pointed out, that the substance of Blount's prior statements to police is not perfectly clear, that is the nature of police reports. Limiting a criminal defendant to using only clear and directly contradictory statements for impeachment is inconsistent with New York evidence law. *See Wise*, 46 N.Y.2d at 326, 413 N.Y.S.2d 334, 385 N.E.2d 1262.

Finally, the trial court erred in ruling that Laboy failed to lay a proper foundation to impeach Blount with her prior inconsistent statement. New York law requires only that the cross-examiner fairly and clearly apprise the witness of the statements which may be subject to impeachment by first questioning the witness as to the time, place, and substance of the prior statement. *People v. Duncan*, 46 N.Y.2d 74, 80–81, 412 N.Y.S.2d 833, 837–38, 385 N.E.2d 572, 576 (1978). Defense counsel attempted to lay this foundation by referring Blount to a particular conversation that she had with the police and asking Blount about specific state-

ments that she made in the conversation. This was sufficient to fairly and clearly apprise Blount of the statements which were subject to impeachment, and it provided Blount with the opportunity to explain any apparent inconsistency between her prior statements and her testimony at trial. Therefore, the trial court erred in ruling that Laboy failed to lay the proper foundation to impeach Blount with her prior inconsistent statements.

Consequently, the trial judge improperly limited Laboy to one type of foundation question to pursue this avenue of impeachment, i.e., "did you tell this housing Detective that the shooter was a male black?" Tr. at 251. In so doing, the trial court improperly limited impeachment only to prior statements that directly and positively contradicted the witness' testimony and, therefore, erroneously barred Laboy from pursuing a proper area of inquiry relevant to the jurors' determination of Blount's credibility.

### C. Evidentiary Error Does Not Rise to Level of Constitutional Error

Although the trial court improperly precluded Laboy from inquiring into Blount's prior statements, the error does not rise to the level of constitutional error.

Not all erroneous evidentiary rulings rise to the level of constitutional error sufficient to warrant the issuance of a writ of habeas corpus. See Taylor v. Curry, 708 F.2d 886, 891 (2d Cir.1983); Vargas v. Walker, No. CV–94–3571, 1996 WL 118555, *3 (E.D.N.Y. Feb. 28, 1996). Constitutional error occurs only in the rare case when the trial court excludes material evidence that would have created a reasonable doubt that did not otherwise exist. Taylor, 708 F.2d at 891, citing United States v. Agurs, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976); Vargas, 1996 WL 118555, at *3.

Moreover, the Confrontation Clause generally guarantees only "an *opportunity* for effective cross-examination," Delaware v. Fensterer, 474 U.S. at 20, 106 S.Ct. at 294. It does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Id. at 20, 106 S.Ct. at 294.

Here, Laboy had ample opportunity to conduct effective cross examination. Indeed, Blount's credibility was impeached in a number of ways. Laboy elicited admissions that Blount's view of the crime was obstructed and that she had come to the crime scene to purchase crack and had used crack just a few hours prior to the killing.

Most significantly, he elicited and emphasized the fact that Blount had failed to identify Laboy in her first four interviews with the police. While Laboy was not permitted to elicit the entire prior statements, the fact of the omissions alone could suggest to a reasonable juror that prior statements likely implicated one of the other individuals Blount described in her testimony as being on the scene at the time of the shooting. In fact, defense counsel argued in closing that one of the other individuals on the scene had killed Arragones and that Blount had lied about Laboy's involvement out of fear of the true perpetrator.[5] While the prior statements themselves may have had some additional impeaching effect, it would not have created a reasonable doubt that did not otherwise exist, since Blount's credibility was already under significant attack.

### D. Any Error Was Harmless

Even if the evidentiary ruling did amount to an error of constitutional magnitude, that error was harmless.

---

5. Defense counsel did not attempt to argue that the man in the grey sweatshirt was the perpetrator, but it does not appear that she would have been precluded from doing so, since the trial judge permitted her to elicit his description and to argue that one of the other people on the scene may have been the shooter. Moreover, on the existing record, Laboy could have argued that one could infer, from the facts that Blount made prior statements about the shooting to police and that she had not mentioned Laboy in those statements, that she had likely implicated someone else as the perpetrator in her earlier versions of events. Laboy did not make this argument in closing. Although the trial judge may have erroneously precluded such argument, any such error is speculative in the absence of an actual attempt to make the argument and thus cannot be the basis for issuing a writ of habeas corpus.

In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the United States Supreme Court articulated the standard of review a federal court should apply to habeas corpus petitions from state prisoners in determining whether a constitutional error was "harmless." *Id.* at 630–31, 113 S.Ct. at 1717–18.

The Supreme Court identified two categories of constitutional error. "Structural errors," which are "structural defects in the constitution of the trial mechanism, defy analysis by 'harmless-error' standards." *Id.* 507 U.S. at 629, 113 S.Ct. at 1717 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991)). An example of such an error is the deprivation of the right to counsel; such a structural error "requires automatic reversal of the conviction because they infect the entire trial process." *Id.* 507 U.S. at 629–30, 113 S.Ct. at 1717.

The other category of error is "trial error," which " 'occurs during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].' " *Id.* at 629, 111 S.Ct. at 1717 (quoting *Fulminante*, 499 U.S. at 307–08, 111 S.Ct. at 1263–64). In the case of "trial errors" before a federal habeas court, the *Brecht* Court held that the *Kotteakos* standard, rather than the *Chapman* harmless error standard,[6] is applicable. *Id.* 507 U.S. at 637, 113 S.Ct. at 1721–22. Under the *Kotteakos* standard, the test is whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 637, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750,

776, 66 S.Ct. 1239, 1253–54, 90 L.Ed. 1557 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Id.* 507 U.S. at 637, 113 S.Ct. at 1722 (citing *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)).

Under the *Brecht* taxonomy, the error in the instant case is trial error, to which the *Kotteakos* standard applies.

Here, it cannot be said that the exclusion of Blount's prior statements had a "substantial and injurious effect or influence in determining the jury's verdict." As previously stated, Blount's credibility was already impeached substantially. While it is arguable that the cross-examination prohibited by the trial judge might have contributed marginally to discrediting Blount, it is unlikely to have swayed a jury that was already aware of significant omissions in her testimony and other reasons to question her credibility.

Some evidence suggests that the jury may have found Blount's testimony suspect even without the impeachment Laboy now contends was central to his case. For example, the jury requested that Blount's testimony be reread to them three times. After having the testimony reread, the jurors sent a note to the trial judge indicating that they were at an impasse. Only after the trial judge urged the jurors to continue deliberations did the jury reach a verdict, rejecting the more serious charge of murder in the second degree and convicting Laboy of the lesser crime of manslaughter in the first degree.[7]

---

6. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court held "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828. Previously, the United States Supreme Court had applied the Chapman standard to federal habeas cases. *See, e.g., Yates v. Evatt*, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).

7. It is difficult to draw inferences from jury signals such as these. It is possible that the jury requested that testimony be reread because they were confused, not skeptical. It is possible that the jury's impasse was over whether to convict on the more serious charge or over whether to convict at all. In light of these imponderables, it is preferable to avoid upsetting the finality of a state court conviction because of a trial error that excluded evidence that would have only a subtly greater impeaching effect than the impeachment that was allowed.

For the reasons set forth above, Laboy's confrontation clause claim will be rejected.[8]

## III. Laboy's Due Process Claim

■ Laboy also contends that the exclusion of Blount's prior inconsistent statements deprived him of his ability to present his defense. Depriving a criminal defendant of his ability to present a defense violates the Due Process clause and warrants issuance of a writ of habeas corpus. *See Roberts v. Scully,* 875 F.Supp. 182, 188 (S.D.N.Y.1995) (*citing Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986); *Chambers v. Mississippi,* 410 U.S. 284, 294–95, 93 S.Ct. 1038, 1045–46, 35 L.Ed.2d 297 (1973)).

■ Laboy contends that his sole defense was that Blount's version of events was false, and that his only way to establish this defense was to impeach Blount with her first version of events.

Laboy's due process claim is without merit. As stated above, Laboy was permitted to cross examine Blount and to impeach her by omission and on several other matters. He was also permitted to argue to the jury that Blount lied out of fear of retaliation. While the prior inconsistent statements may have marginally strengthened Laboy's defense, its exclusion did not deprive him of the defense. The erroneous evidentiary ruling did not rise to a constitutional level, because it did not eliminate evidence that would have created a reasonable doubt that did not otherwise exist. *Taylor v. Curry,* 708 F.2d at 891. Laboy effectively called Blount's credibility into question even without the prior statements.

## IV. A Certificate of Appealability Will Be Issued on Laboy's Sixth Amendment Claim

■ Demskie contends that the appeal provisions of the Antiterrorism and Effective Death Penalty Act of 1994 (AEDPA) apply to this case. Sections 102 and 103 of the AED-PA modify the appellate provisions in habeas corpus cases. In *Reyes v. Keane,* the Second Circuit held that § 102 of the AEDPA applies retroactively to a petition filed before the effective date of the Act. 90 F.3d at 680.

■ The AEDPA provides that an appeal may not be taken "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). Demskie contends that under 28 U.S.C. § 2253(c), only a circuit judge may issue a certificate of appealability. *See Parker v. Norris,* 929 F.Supp. 1190, 1191–92 (E.D.Ark.1996).

However, Rule 22 of the Federal Rules of Appellate Procedure, as amended by AEDPA § 103, suggests that a district court still has power to issue certificates of appealability. Rule 22 provides that an appeal "may not proceed unless a district court or a circuit judge issues a certificate of appealability pursuant to section 2253(c) of title 28, United States Code. If an appeal is taken by the applicant, the district judge who rendered the judgment shall either issue a certificate of appealability or state the reasons why such a certificate should not issue."

There appears to be some disagreement among the courts to have considered whether a district court may issue a certificate of appealability. *Compare Houchin v. Zavaras,* 924 F.Supp. 115, 117 (D.Colo.1996) (since statute does not expressly prohibit district court from issuing certificate of appealability, district court may issue certificate pursuant to Fed.R.App.P. 22); *Adanandus v. Johnson,* No. SA–95–CA–415, 1996 WL 622555 (W.D.Tex. Oct. 16, 1996) (district court issuing certificate of appealability); *with Parker v. Norris,* 929 F.Supp. at 1191–92 (AEDPA section 2253(c), "by its express terms, has divested district judges (as opposed to circuit judges) of the authority to rule on" certificates of appealability). However, this Court determines it has the authority to issue a certificate of appealability pursuant to Fed. R.App.P. 22.

---

**8.** Laboy's argument that the trial judge erred in refusing to permit him to question the police officers about Blount's prior statements is essentially redundant, and thus denied on the grounds stated above. Had Laboy been permitted to ask Blount about her prior statements, and Blount had admitted to them, he would not have been permitted to introduce extrinsic evidence of them through the officers. Had Blount denied them, the police would have been a means of proving the prior statements. Precluding their testimony is thus not a separate error.

Title I, § 102 of the AEDPA provides that a "certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). Demskie contends that this standard requires a petitioner to make a more substantial showing of a constitutional violation to receive a certificate of appealability ("COA") than was required to obtain a certificate of probable cause ("CPC") under prior law.

However, the Second Circuit in *Reyes* held that "the substantive standard for a COA is the same as the standard for the prior CPC." 90 F.3d at 680. Therefore, in order to obtain a COA, a petitioner need not show he should prevail on the merits; instead, he need only "demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3395 n. 4, 77 L.Ed.2d 1090 (1983) (internal quotation marks and citations omitted).

Demskie contends that even under the previous standard, a certificate should not issue because the petition presents no question deserving of appellate review, *Alexander v. Harris*, 595 F.2d 87, 91 (2d Cir. 1979), poses no issue of first impression upon which the Second Circuit should rule, *United States ex rel. Pihakis v. Thomas*, 488 F.Supp. 462, 467 (S.D.N.Y.1980), and raises no issue of substance. *Stephens v. LeFevre*, 467 F.Supp. 1026, 1031 (S.D.N.Y.1979).

As discussed above, Laboy's due process claim is without merit and no certificate of appealability will be issued as to this claim. However, the petition does raise a significant question about the extent to which impeachment may be restricted without violating the Sixth Amendment right to confront witnesses. The petitioner has thus made the requisite "substantial showing of the denial of a constitutional right." Reasonable jurists could disagree with this Court's resolution of the petitioner's claim. Moreover, the question presented "deserves encouragement to proceed further," since appellate review could provide important guidance to federal habeas courts in this circuit. Therefore, a certificate of appealability will be issued.

## Conclusion

For the foregoing reasons, Laboy's petition for a writ of habeas corpus is hereby denied. A certificate of appealability is hereby granted on the issue of whether Laboy's constitutional right to confront witnesses was abridged.

It is so ordered.