People v Cajal (2024 NY Slip Op 50779(U))

[*1]

People v Cajal

2024 NY Slip Op 50779(U)

Decided on June 24, 2024

Criminal Court Of The City Of New York, Kings County

Glick, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 24, 2024
Criminal Court of the City of New York, Kings County

The People of the State of New York

against
Ailen Cajal, Defendant.

Docket No. CR-034221-22KN

People: Kings County District Attorney's Office by ADA Alessandra Riccardi
Defendant: The Kugel Law Firm by Rachel Kugel, Esq.

Joshua Glick, J.

Defendant is charged with V.T.L. §1192(3), Driving While Intoxicated and related charges in connection with an incident that allegedly occurred on November 26, 2022.
Defendant moves to suppress noticed statements, police observations, video recordings, all other fruits of her arrest, and evidence of her refusal to submit to chemical testing. Defendant also moves to preclude non-noticed statements.
The Prosecution opposes.
On February 3, 2024, and May 30, 2024, the Court conducted a combined Dunaway, Huntley, and refusal hearing. The Prosecution presented two witnesses, Officer Kareem Robinson and Sergeant Jeannette Santiago, both members of the New York City Police Department (NYPD). The Prosecution admitted into evidence the body-worn camera footage (BWC) of Sgt. Santiago and video footage from the Intoxicated Driver Testing Unit (IDTU). Defendant did not present any witnesses or admit any evidence. After testimony was concluded, both parties made oral arguments.
The Court now makes the following findings of fact and conclusions of law.
 FINDINGS OF FACT
The Court finds as fact all events depicted in the videos admitted into evidence. The Court also credits the testimony of Officer Robinson and Sgt. Santiago to the extent set forth below and makes the following specific findings of fact.
Testimony of Sergeant Santiago
Sgt. Santiago has been employed by the NYPD for nineteen years. She has been assigned to the Internal Affairs Bureau for the past six months. At the time of the arrest in this case, she was assigned to the 94th Precinct as a patrol sergeant. Sgt. Santiago received training on recognizing the signs of intoxication at the Police Academy, as well as updated one-off trainings throughout her career. Some of the signs of intoxication she has been trained to recognize are slurred speech, watery eyes, impaired judgment, the scent of alcohol, and repetitive speech. She has made an estimated two arrests for suspected driving while intoxicated during her career and has assisted in more than ten others.
On November 26, 2022, Sgt. Santiago was working from midnight until 8:00 a.m. with a [*2]partner, Officer John McEvoy in uniform, in a marked police vehicle. Around 1:00 a.m., Sgt. Santiago and Officer McEvoy were patrolling the vicinity of Meeker Avenue in Greenpoint when they observed Defendant's vehicle atop the median that divides the McDonald's parking lot from the sidewalk. Although it was dark out, the parking lot was well lit. The car was turned on and Defendant was the sole occupant. Sgt. Santiago noticed that the median was not very high; she later learned from McDonald's employees that it was common for vehicles to accidentally drive over it. Sgt. Santiago approached Defendant's vehicle, Defendant put her window down, and a conversation ensued. Defendant said she had called a tow truck and was waiting for it to arrive. Defendant also expressed that she was embarrassed. Sgt. Santiago noticed that Defendant's eyes were glassy, she seemed dazed, and she spoke slowly. Defendant repeated her statements about the tow truck multiple times. Sgt. Santiago asked Defendant if she had been drinking, to which Defendant responded that she had a couple drinks, the last of which was about four hours prior. Sgt. Santiago requested Defendant's license; before Defendant could comply, Sgt. Santiago ordered Defendant out of the vehicle. Defendant did not immediately exit the vehicle; it took a couple requests before she got out. Once outside, Officer McEvoy immediately handcuffed her. Prior to ordering her out of the vehicle, Sgt. Santiago had interacted with Defendant for approximately two to three minutes total.
After Defendant was cuffed, Sgt. Santiago observed that her eyelids were moving slowly. Defendant seemed upset and began to cry. Sgt. Santiago asked again if Defendant had been drinking, which she answered affirmatively, and if she was on any medication, which she denied. No one advised Defendant of her Miranda rights on scene.
Officer McEvoy completed the arrest paperwork, which Sgt. Santiago oversaw and approved. In the arrest paperwork, Officer McEvoy noted no odor or alcoholic beverages, that Defendant's clothes were orderly, that her attitude was cooperative, and that her speech was clear. Prior to Sgt. Santiago's arrival, Defendant had spoken with two other police officers. When Sgt. Santiago conferred with the other two officers, neither indicated a suspicion that Defendant was impaired by anything. 
Testimony of Officer Robinson
Officer Robinson has been employed by the NYPD for approximately seven years. For the past three years, he has been assigned to Highway One as a highway patrol officer. Officer Robinson received training from the Highway Safety District Training School on the Intoxilyzer 9000, which tests breath alcohol content, and Standardized Field Sobriety Testing, which tests motor skills for drivers suspected of intoxication. He has made approximately thirty arrests for suspected driving while intoxicated and has participated in over two hundred.
On November 26, 2022, Officer Robinson was working as the IDTU technician at the 78th Precinct. Defendant was brought to the 78th Precinct and seated in the IDTU room. From 2:29 a.m. until 2:49 a.m., Officer Robinson observed Defendant according to NYPD standard procedure. At 2:49 a.m., Officer Robinson read the IDTU warnings to Defendant and offered her a breath test, which she refused. Officer Robinson then read refusal warnings to Defendant and again offered her a breath test, and again she refused.

 CONCLUSIONS OF LAW
At a suppression hearing, the prosecution has the burden of going forward to show, by credible evidence, the lawfulness of the police conduct (People v Hernandez, 40 AD3d 777 [*3][2007]; see also People v Berrios, 28 NY2d 361 [1971]; People v Wise, 46 NY2d 321 [1978]). To evaluate the police conduct, the Court must determine whether it was justified at its inception and whether it was reasonably related in scope to the circumstances at the time (People v DeBour, 40 NY2d 210 [1976]). If the prosecution satisfies the initial burden of going forward, the defendant "bears the ultimate burden of proving that the evidence should not be used against him" (People v Berrios, 28 NY2d at 367).
The Court of Appeals has established a four-tiered method for evaluating the propriety of police-initiated street encounters (People v DeBour, 40 NY2d at 223). Level one allows the police to request information based on an objective, credible reason, not necessarily indicative of criminality (DeBour at 223). Level one requests for information include only basic, nonthreatening questions, such as identity, address, or destination (People v Hollman, 79 NY2d 181, 185 [1992]). Level one also permits an officer to approach a parked vehicle (People v Eugenio, 185 AD3d 1050, 1051 [2020]). Level two is the common-law right of inquiry based on a founded suspicion that criminal activity is afoot (Debour at 223). Pointed questions that would lead the person approached to reasonably believe he or she is suspected of some wrongdoing require level two suspicion (People v Hollman, 79 NY2d at 185). Level three authorizes the police to forcibly stop and detain a person if the police have a reasonable suspicion that the person was involved in a crime (DeBour at 223). Finally, level four permits police to arrest a person based on probable cause that he or she has committed a crime (id.).
When a police officer effectuates a vehicle stop, it is "virtually per se reasonable to insure [sic] the officer's safety" to order that occupants exit the vehicle (People v Larkin, 62 Misc 3d 62, 66 [2018]; Michigan v Long, 463 U.S. 1032 [1983]). However, where police approach an already-parked vehicle, ordering a person to exit the vehicle is the constitutional equivalent of a stop and must be supported by a reasonable suspicion that the person has committed, is committing, or is about to commit an offense (People v Larkin, 62 Misc 3d at 66). "Reasonable suspicion requires the quantum of knowledge necessary to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (Larkin at 66 [internal quotations omitted]).
In this case, Sgt. Santiago saw Defendant's car straddling the median between the parking lot and sidewalk. Because the car was stopped when police first observed it, they needed an objective, credible reason to approach; in other words, this was a De Bour level one encounter (People v Harrison, 57 NY2d 470, 475 [1982]). It was not lawfully parked, but rather stopped in a precarious position that strongly implied something had gone awry, albeit not necessarily anything criminal. The circumstances created an objective, credible reason, not necessarily indicative of criminality for the police to seek information. Thus, the police behaved lawfully when they approached Defendant's car (People v Valerio, 274 AD2d 950 [2000] [holding that a vehicle being illegally parked provides only an objective, credible reason for police to approach and does not elevate the circumstances to De Bour level two]; People v Carr, 103 AD3d 1194 [2013] [affirming the holding in People v Valerio]; see generally People v Brown, 2024 NY Slip Op. 02765 [2024] [noting that the community caretaking doctrine permits minor police intrusions as needed for them to assist drivers whose vehicles become disabled for reasons totally divorced from criminality]).
Immediately following Sgt. Santiago's approach, Defendant explained that she had called a tow truck and that she was embarrassed, presumably about driving up on the median. Defendant's eyes were glassy, she seemed dazed, and she spoke slowly and repetitively, but Sgt. [*4]Santiago did not notice any other indicia of intoxication. Although Officer McEvoy did not testify at the hearing, the arrest paperwork he completed does not indicate he noticed any signs of intoxication. Although Sgt. Santiago testified that repetitive speech can be a sign of intoxication, there are numerous innocent explanations for Defendant's appearance and speech patterns. Glassy eyes, seeming dazed, and slow speech could be signs of exhaustion — this encounter took place at 1:00 a.m. Repetitive speech may suggest nervousness — people are often nervous around police, despite being innocent of wrongdoing. Slow, repetitive speech together could indicate a lack of fluency in the spoken language. There are myriad possible reasons for Defendant's presentation that do not implicate criminality. Ultimately, the circumstances at hand warranted a request for information, which should have informed further police action.
Nevertheless, almost immediately Sgt. Santiago asked Defendant if she had been drinking. This inquiry goes beyond the realm of a De Bour level-one request for information. Faced with Defendant's circumstances — the car was atop the median and as the only occupant, Defendant was the presumptive driver — an ordinary person approached by police and asked a pointed question about consuming alcohol would make her reasonably believe she was suspected of wrongdoing, specifically driving under the influence (see People v Hollman, 79 NY2d 181). This question would have been justified by a founded suspicion that criminality was afoot, which is plainly not borne out by the information known to police at the time (People v Fay, 28 Misc 3d 1204[A] [2010] [holding that the combination of the defendant having a startled look on her face as she passed a police car and the police smelling an odor of alcohol coming from the vehicle did not rise to De Bour level two suspicion]).
Because Sgt. Santiago was not justified in asking whether Defendant had been drinking, it follows that her subsequent police action based on Defendant's affirmative reply was also improper. However, assuming in arguendo that Sgt. Santiago had only requested information as permitted by a De Bour level one encounter, her directive for Defendant to exit the car was also improper for the same reason: such an order requires founded suspicion of criminality, which the police did not yet have (People v Larkin, 62 Misc 3d at 66).
Although it is well established that evidence obtained because of illegal police conduct is inadmissible under the fruit of the poisonous tree doctrine, such exclusion does not apply "if the impact of the illegal arrest does not closely touch upon the challenged evidence" (People v Rogers, 52 NY2d 527, 532 [1981]). Sufficient attenuation between the police action and the ill-gotten evidence can overcome the taint of the original illegality (United States v Crews, 445 U.S.463, 471 [1980]). Attenuation may be sufficient "where the evidence challenged was the product of a source independent of the defendant's detention; and where the discovery of the challenged evidence was attenuated from the illegal activity by a significant intervening event which [justifies] the conclusion that that evidence was not the product of the illegal activity" (People v Rogers, 52 NY2d at 533). In short, the question of exclusion boils down to whether the evidence was obtained by exploiting the illegality or by some sufficiently distinguishable means (Brown v Illinois, 422 U.S. 590 [1975]).
Here, no such attenuation exists. The sequence of events following Defendant's exit from the vehicle on Sgt. Santiago's order was immediate and unbroken. Defendant's inculpatory statements to police regarding her alcohol consumption occurred on scene within seconds of being handcuffed, in response to a question by police and prior to the issuance of Miranda warnings. Once handcuffed, Defendant was promptly put in the back of a police car and transported directly to the 78th Precinct. Once there, she was put into the IDTU room and offered [*5]a breath test, which she refused. There exists neither an independent source by which the police gathered this evidence nor a significant intervening event. Accordingly, all evidence obtained by police following their unlawful conduct — asking Defendant if she had been drinking while she was still inside the vehicle — must be suppressed (People v Newson, 155 AD3d 768 [2017]).
Preclusion of Unnoticed Statements
To use a defendant's own statement as evidence at trial, the prosecution must give the defendant proper notice of the statement pursuant to CPL §710.30(1)(a). The remedy for a lack of or improper notice is preclusion (CPL §710.30[3]).
Defendant's motion to preclude unnoticed statements is granted (CPL §710.30[3]; People v Lopez, 84 NY2d 425 [1994]).

 CONCLUSION
Defendant's motion is GRANTED in its entirety.
This constitutes the decision and order of the Court.
Dated: June 24, 2024
Brooklyn, New York
ENTER:
Hon. Joshua Glick