Eli LEWIS, Petitioner,

v.

Floyd G. BENNETT, Superintendent, Respondent.

No. 02–CV–6289L.

United States District Court, W.D. New York.

July 12, 2004.

Eli Lewis, Elmira Correctional Facility, Elmira, NY, pro se.

Loretta S. Courtney, Monroe County District Attorney's Office, Rochester, NY, for Respondent.

## DECISION AND ORDER

LARIMER, District Judge.

### INTRODUCTION

Petitioner, Eli Lewis ("Lewis"), filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on one count of felony murder and four counts of robbery.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

At about 10:12 p.m. on November 28, 1995, members of the Rochester Police Department responded to 1009 Joseph Avenue for a reported shooting. Upon arrival, Officer Marcos Rodriguez ("Rodriguez") observed two men jump out of a door or window at the rear of the house and begin to flee on foot. Rodriguez saw one man appear to remove an item of clothing as he fled the scene. After a short foot chase, Rodriguez apprehended Lewis, who was not wearing a shirt or jacket and was naked from the waist up. Rodriguez secured Lewis in a patrol car at the scene, where he remained for about 35 minutes.

Other police officers who arrived on the scene observed the occupant of 1009 Joseph Avenue, Shawn Hart ("Hart"), lying dead on the kitchen floor in a large pool of blood. His pants pockets had been turned inside-out and a wallet lay on the floor near his body. In the bathroom, which adjoined the kitchen, the police observed a sawed-off shotgun and a mask.

At about 10:55 p.m., Rodriguez transported Lewis to the Public Safety Building. On the drive, which took about fifteen minutes, Lewis spontaneously stated to Rodriguez, "there was a lot of blood on the kitchen floor" at 1009 Joseph Avenue. According to Rodriguez, he had asked no questions of Lewis, nor had he said anything to Lewis to provoke any response from him. Once they arrived at the police station, Lewis was brought to an interrogation room where he remained until about 1:40 a.m. At that time, Investigators Siersma ("Siersma") and Sheridan ("Sheridan") escorted Lewis to their office, where Sheridan advised Lewis of his *Miranda* rights. Lewis agreed to waive his rights and speak with the investigators.

During the interview with Siersma and Sheridan, Lewis at first denied any involvement, claiming that he merely was trying to purchase marijuana at the drug house operated by Hart. About forty minutes later, after being confronted with several witnesses' statements, Lewis orally admitted to participating in the planning and execution of the robbery at 1009 Joseph Avenue. At about 3:31 a.m., as a written statement encompassing Lewis's oral confession was being prepared, Lewis stated that he was not going to sign anything and requested an attorney. All questioning ceased at that time. Lewis, however, continued to press Sheridan about the possibility of entering into a

"deal" with the police. Sheridan informed Lewis that he could not enter into a deal with Lewis, but if Lewis was cooperative, Sheridan could relay that information to the district attorney. Lewis subsequently was charged with one count of felony murder and four counts of first degree robbery.

Following a hearing in Monroe County Court (Marks, J.) denied Lewis's motion to suppress his statements to police on November 28 and November 29, 1995, finding that the statement made by Lewis as he was being transported to the police station was "voluntary, spontaneous and not the result of any interrogation[.]" Respondent's Appendix of Exhibits ("App.") at 124. The court also found that the prosecution had proven beyond a reasonable doubt that Lewis's confession to the police was voluntary and not the product of threats or coercion. *Id.* The court also granted Lewis's request for severance and scheduled a double jury trial for Lewis and Freddie Glover to begin on June 3, 1996. A separate trial for Shawn Glover was scheduled for July 29, 1996.

The Lewis jury and the Glover jury jointly heard the testimony of all witnesses except Sheridan and Siersma, who were responsible for interrogating Lewis and Glover. A summary of the relevant trial testimony follows.

Willie Randle ("Randle") testified that on the evening of November 28, 1995, he had come over to Hart's house on Joseph Avenue to hang out and help set up some stereo equipment. At about 10 p.m., there was a knock at the door. Jose Rivera ("Rivera"), who also was visiting Hart, answered the door. Soon thereafter, Randle heard the sound of a shotgun being pumped outside. Hart had joined Rivera at the front door, and Randle observed Rivera and Hart begin backing away quickly from the door. Randle heard three voices demanding to know where the

money was and then the sound of shots being fired. Randle immediately dropped to the floor. Moments later, he was ordered by to strip naked and stay down on the floor. He testified that he did not look up to see the intruders' faces, but he could tell that there were three males. *See* Trial Transcript ("Trial Tr.") at 148–55.

At one point, Randle heard one of them say, "Where is the money, you got to know where the money is!" Another voice said, "I shot one of them." A third voice said, "They are all going to die anyway. Kill all of them anyway." *Id.* at 156–57, 174–75. Randle testified that his jewelry was ripped from him and his wallet taken from his pocket, along with his pager. *Id.* at 158. Someone stood over him with a revolver and pulled the trigger several times. *Id.* at 160. Then, according to Randle, it became quiet. He heard the sound of a police radio coming from the kitchen. *Id.* Randle could not identify any of the perpetrators because they were wearing masks.

Rivera testified that he had come over to Hart's house to drink some beers and smoke marijuana that night when they heard a knock on the door at about 10 p.m. When Rivera answered the door, a black male said, "I want a nic [*sic*]," and reached for his pocket. Rivera saw that the man was wearing latex gloves, so he locked the door and told Hart, "[I]t is a stick-up." *Id.* at 334–35. Hart pushed Rivera aside and said, "[L]et me take care of this." The next thing Rivera knew, Hart was on the ground and a man with a shotgun was standing to the side with a shotgun trained on his (Rivera's) face. *Id.* at 335. Rivera saw another man with a pistol who came in and began shooting into the ceiling. *Id.* at 362.

The man with the shotgun told Rivera to get on the ground and take his clothes off; Rivera complied. *Id.* at 337. Rivera heard someone yelling repeatedly, "Shawn,

where is the money?" Rivera heard Hart say that he did not have any in the house and to "take whatever was in the box [which contained Hart's drug stash]." *Id.* at 337–38. At that point, Rivera heard a gun go off followed by a loud thud. *Id.* at 338, 351. He heard someone say, "I popped one. I popped one." *Id.* at 338. Rivera tried to look up as someone ran past him, and the man with the shotgun hit him in the head. *Id.* Rivera was unclear as to whether the man with the latex gloves came into the house.

Jennifer Sarquist, Hart's girlfriend, testified that on the night of November 28, she was sitting in the kitchen when she heard a "commotion" in the living room; she turned around to see Hart falling over a speaker and heard the sound of a gunshot. The first thing she saw was a man with a shotgun (*i.e.*, Freddie Glover) in the living room. Sarquist ducked into the bathroom. *Id.* at 273–74. She did not see Hart get shot, *Id.* at 275. Once in the bathroom, Sarquist used the cordless phone to call 911. Scared that they would find her in the bathroom, she then opened the door and saw a man, about 5'6" and wearing a mask, standing over Hart with a small handgun. He (*i.e.*, Shawn Glover) ordered her to get down on the floor and go through Hart's pockets to see if he had any money. *Id.* at 278–79. Another person came into kitchen; he had reddish hair,[1] was not wearing a mask and had no shirt on. A third person came from the back porch area into the kitchen, also wearing a mask. *Id.* at 280–81.

When she had finished going through Hart's pockets, they ordered her back into the bathroom. The man with the shotgun then pushed his way into the bathroom.[2]

*Id.* at 283. Sarquist finally persuaded him to let her leave the bathroom. When she emerged, there was a police officer standing in the kitchen. The man with the shotgun (*i.e.*, Freddie Glover) exclaimed, "[T]hey shot my home boy!" Pretending to be one of the victims, he started to walk toward the front door. Sarquist insisted to the police that he was the one who had shot Hart, and the police restrained him from leaving. When they attempted to put him and Sarquist into the same police cruiser, Sarquist objected vehemently and was placed into another car.

When the police first arrived on the scene, they saw two black males wearing dark clothing in the kitchen. Upon hearing the police outside, the two men looked up in surprise and then ran through the kitchen and jumped out of a window. *E.g.*, *id.* at 127–27. One of the fleeing men was seen discarding a dark hooded sweatshirt as he ran from the vicinity. *E.g.*, *id.* at 138, 432–39, 465. Both men were apprehended after a foot chase. When Lewis was caught, he was wearing nylon jogging pants and was naked from the waist up. *Id.* at 437–38. He was placed into a patrol car; when the car later was searched, the officer found a black mask and a pager. *Id.* at 443.

Siersma and Sheridan testified at trial regarding the substance of the oral statements made by Lewis after his arrest. According to them, Lewis first claimed that he just happened to be at 1009 Joseph Avenue buying drugs. At one point during the interrogation, after Lewis remarked that he was not having a very good day, Sheridan showed Lewis a photograph of the deceased and said, "This man

---

1. There was proof at trial that at the time of the incident, Lewis had reddish hair. At the time of trial, however, Lewis's hair color was black and he had changed his hairstyle. *E.g.*, *id.* at 439.

2. This man was not wearing a mask and Sarquist was able to identify him as Freddie Glover.

isn't going to have any more good days." Lewis then claimed that he had gone along with the Glovers to the drug house when they went to retrieve some money owed to Freddie Glover. Forty minutes later, after being confronted with statements by several of the witnesses, Lewis admitted that it was a planned robbery. According to Lewis, the Glover brothers needed money, and Freddie Glover felt that the occupant of Joseph Avenue owed him money. Lewis said that he agreed to help the Glover brothers stage a home-invasion robbery at the drug house in return for a cut of the proceeds. His role was to allow the Glover brothers to gain entry to the house by posing as a person interested in purchasing drugs. He admitted to picking up a pager that had fallen to the floor. Lewis stated that he removed his jacket and shirt before he ran out the backdoor to make it appear as though he was a victim. *E.g., id.* at 673–78.

The jury returned a verdict convicting Lewis of all counts in the indictment. Lewis was sentenced to 20 years to life on the murder charge (count one) and 10 to 20 years on each of the first degree robbery charges (counts two through five). The sentences for counts two and three (the Hart robbery charges) were set to run concurrently to each other, but consecutively to count one. The sentences for counts four and five (the Randle robbery charges) were set to run concurrently to each other, but consecutively to counts two and three.

The Appellate Division, Fourth Department, affirmed Lewis's conviction on De- cember 27, 2000. *People v. Lewis,* 278 A.D.2d 819, 719 N.Y.S.2d 433 (4th Dept. 2000). The New York Court of Appeals denied leave to appeal on February 26, 2001. *People v. Lewis,* 96 N.Y.2d 760, 725 N.Y.S.2d 287, 748 N.E.2d 1083 (2001).

This habeas petition followed in which Lewis raises the following grounds for relief: (1) ineffective assistance of trial counsel and appellate counsel premised upon their "respective failure to contest the court's jurisdiction; the lack of a statutory provisions in the usage of the dual juries selection process; and the lack of a record of defendant's knowing or intelligent waiver of his right to select a jury in accordance with the state's jury process"; (2) failure of trial counsel to seek a *Dunaway* hearing;[3] (3) failure of appellate counsel to argue that trial counsel was ineffective for failing to request a *Dunaway* hearing; (4) insufficiency of the evidence with regard to defendant's intent; (5) failure of the trial court to deny suppression of defendant's statements to police; and (6) failure of the trial court to suppress identification evidence that was not properly disclosed prior to trial. For the reasons set forth below, Lewis's § 2254 petition is denied.

## DISCUSSION

### I. Exhaustion

■■■■ A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of

---

**3.** In *Dunaway v. New York,* the Supreme Court held that the police violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they seized petitioner and transported him to the police station for interrogation. *See* 442 U.S. 200, 216, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). When an accused in New York challenges the constitutionality of his arrest, he is entitled to a sum- mary grant of a *Dunaway* heading if he submits sworn allegations of fact supporting the motion and the People concede the truth of the allegations of fact therein. *See* C.P.L. § 710.60(1) & (2)(a). However, the court may summarily deny the motion if the accused does not allege a ground constituting a legal basis for the motion. *See* C.P.L. § 710.60(3)(a).

habeas corpus in federal court. 28 U.S.C. § 2254(b); *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained. *See Morgan v. Bennett,* 204 F.3d 360, 369 (2d Cir.2000) (citing *Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991)). A claim is properly exhausted when the state court is fairly apprised of the claim's federal nature and of the factual and legal premises underlying the claim. *Grey,* 933 F.2d at 119–20.

■ In the past, a state prisoner's federal habeas petition had to be dismissed if the petitioner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). However, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3).

■ Respondent states that "[o]n the issue of exhaustion, petitioner has raised each general issue in state appellate courts." Respondent's Answer ("Resp.Ans.") at 4 (Docket # 6). Respondent argues, however, that Lewis did not raise the specific factual basis for his present *"Miranda* claim" in the state courts below. *See id.* at 18. Respondent notes that "[w]hile the record shows that petitioner raised a *Miranda* issue in State Appellate Courts, he did so within the context of his allegation that he was improperly denied a Probable Cause Hearing[,]" but he did not argue that a Fifth Amendment violation occurred due to the length of time which passed prior to his being read his *Miranda* warnings. *Id.*

In response, Lewis states that his *Miranda* argument "is embedded within the scope of a [*sic*] ineffective assistance of Counsel [claim] at both the trial and appellate court levels." Petitioner's Traverse ("Trav.") at ¶ 5 (Docket # 13). He concedes that the arguments are "somewhat different in texture" but maintains that the "central issue[ ] rest[s] in the deficiency of the services rendered which surmount [*sic*] to deprivation of Petitioner's right to effective representation." *Id.*

Lewis's state appellate brief, however, contains no claim that his trial counsel provided constitutionally deficient representation. Moreover, as respondent points out, Lewis filed no collateral motions. This means that Lewis did not challenge his trial counsel's performance in a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. Nor did Lewis contest, in an application for a writ of error *coram nobis,* the adequacy of appellate counsel's performance. As such, Lewis's *Miranda* claim cannot be "embedded" in his ineffective assistance of counsel claims since no such ineffective assistance claims were raised in the state courts. Furthermore, the ineffective assistance of counsel claims raised in the present habeas petition do not even address the delayed issuance of *Miranda* rights.

The only mention of *Miranda* rights occurred in appellate counsel's argument concerning whether the trial court improperly denied Lewis a probable cause hearing. Noting that at some point during the

late night of November 28 and early morning of November 29, custodial interrogation "clearly took place[,]" appellate counsel stated that "[t]his begs the question of when the *Miranda* rights should have been given." Petitioner's Appellate Brief ("Pet.App.Br.") 4, Respondent's Appendix ("App.") at 11. Appellate counsel observed that this question, among others, only could be answered during a probable cause hearing. *Id.* Counsel made no further reference to, or argument concerning, the issuance of *Miranda* rights.

■ I find that the foregoing statements by appellate counsel were insufficient even to implicitly raise an argument that Lewis was denied his Fifth Amendment rights due to a delay in his being given the *Miranda* warnings. The *Miranda* claim therefore remains unexhausted. It is clear, however, that Lewis is procedurally barred from returning to state court in order to exhaust this claim. First of all, he has already used the one appeal to the New York Court of Appeals to which he is entitled. *See* N.Y. Court Rule § 500.10(a). Although Lewis could bring a motion to vacate the judgment pursuant to C.P.L. § 440.10, raising this issue on such a motion would be futile; the state court would deny the *Miranda* claim pursuant to C.P.L. § 440.10(2)(c) since Lewis could have raised it on direct appeal, but failed to do so. Thus, Lewis's purported *Miranda* claim is "deemed exhausted." *See Grey v. Hoke,* 933 F.2d at 120–21.

I am precluded from considering this procedurally defaulted claim unless Lewis "can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (citations and internal quotations omitted); *see also Schlup v. Delo,* 513 U.S. 298, 321,

115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (a fundamental miscarriage of justice requires a showing of "actual innocence"). Lewis does not allege cause or prejudice, nor does he attempt to show that a fundamental miscarriage of justice will occur should I decline to review his claim. Indeed, I find no basis on this record for overlooking the procedural default. Therefore, the *Miranda* claim is precluded from habeas review.

■ Turning to Lewis's remaining claims, it is apparent that respondent was mistaken in saying that Lewis "raised each general issue" in the state courts. Although Lewis presented his insufficiency of the evidence claim, his claims regarding the suppression of his statements to police and the suppression of certain identification evidence, and his sentencing claim on direct appeal, Lewis has not raised any of his ineffective assistance claims in the trial courts. As mentioned above, Lewis never challenged the performance of his trial attorney on direct appeal or in a collateral motion. And the only way Lewis could have contested the performance of his appellate counsel was through a collateral application for a writ of error *coram nobis,* which he did not file. Thus, Lewis never presented his ineffective assistance of trial and appellate counsel claims to the state courts. Oddly, respondent's brief refers explicitly to Lewis's failure to pursue any collateral motions, and yet respondent does not urge that the ineffective assistance of trial counsel and ineffective assistance of appellate counsel claims be dismissed for failure to exhaust state court remedies.

Although respondent, through counsel, may waive the exhaustion requirement, the waiver must be explicit. Under the circumstances of this petition, I am in some doubt as to whether respondent waived the nonexhaustion defense to

those claims. Respondent merely said that "petitioner has raised each general issue in state appellate courts." *Cf. Lurie v. Wittner,* 228 F.3d 113, 123 (2d Cir. 2000) (declining to find express waiver because counsel's statement in the district court was ambiguous; counsel stated on oral argument, when discussing the unexhausted claim, "[Petitioner] did make these arguments in the Appellate Division;" counsel was not discussing the issue of exhaustion at that time), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1404, 149 L.Ed.2d 347 (2001). Here, however, respondent was asked by this Court in an order entered August 5, 2002, to identify any grounds alleged not to have been exhausted and "expressly state whether it waives the petitioner's requirement to exhaust." *See* 8/05/02 Order at 2 (Docket # 5). Respondent prefaced the statement about petitioner's having raised "each general issue" in state court with the sentence, "On the issue of *exhaustion* [.]" Resp. Ans. ¶ 14 at p. 4 (emphasis in original). Thus, respondent apparently was attempting to respond to the Court's direction to state its position as to the exhaustion issue. On the other hand, respondent raised the nonexhaustion defense as to the *Miranda* claim. This leads the Court to surmise that had respondent perceived that the ineffective assistance claims had not been raised in the state courts, it would have raised the nonexhaustion defense as to those claims.

This time-consuming guesswork would be avoided if respondent would state *explicitly,* as directed in the Court order, whether it waived the exhaustion requirement. If respondent had explicitly waived the exhaustion requirement, the Court would be able treat the waiver as valid even though the claims remained unexhausted. Under pre-AEDPA law and the circumstances presented here, I would have been able to infer waiver from respondent's conduct. *See Banks v. Dretke,*

—— U.S. ——, 124 S.Ct. 1256, 1280, 157 L.Ed.2d 1166 (2004) ("[W]hile [the Antiterrorism and Effective Death Penalty Act ('AEDPA')] forbids a finding that exhaustion has been waived unless the State expressly waives the requirement, under pre-AEDPA law, exhaustion and procedural default defenses could be waived based on the State's litigation conduct."). Here, however, I am faced with an ambiguous statement from respondent's counsel, a statutory directive that the exhaustion waiver must be explicit, and clearly unexhausted claims. On the facts before me, I cannot conclude that respondent explicitly waived the exhaustion requirement as to Lewis's ineffective assistance of counsel claims.

I note, however, that an exception to the exhaustion requirement set forth in *Rose v. Lundy, supra,* has been provided for by statute. Now, pursuant to AEDPA, a district court may, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). Section § 2254(b)(2) allows a district court to reach the merits of a habeas corpus petition despite nonexhaustion, thereby "effectuat[ing] congressional intent, conserv[ing] judicial resources, and afford[ing] petitioner prompt adjudication of his claim." *Steele v. Walter,* 11 F.Supp.2d 252, 257 (W.D.N.Y.1998) (quoting *Cowan v. Artuz,* 1996 WL 631726, at *5 (S.D.N.Y.1996)) (quoted in *Loving v. O'Keefe,* 960 F.Supp. 46, 49 (S.D.N.Y.1997)).

Although the Second Circuit has not yet enunciated a standard for determining when unexhausted claims should be denied on the merits under Section 2254(b)(2), the majority of district court decisions in this

Circuit, including decisions from this Court, have embraced a "patently frivolous" test for dismissing unexhausted claims. *See, e.g., Hammock v. Walker,* 224 F.Supp.2d 544, 548–49 (W.D.N.Y.2002) (Larimer, J.); *Cruz v. Artuz,* 2002 WL 1359386, at *8 (E.D.N.Y. June 24, 2002); *Pacheco v. Artuz,* 193 F.Supp.2d 756, 761 (S.D.N.Y.2002); *Rowe v. New York,* 2002 WL 100633, at *5 (S.D.N.Y. Jan.25, 2002); *Love v. Khulman,* 2001 WL 1606759, at *5 (S.D.N.Y. Dec.12, 2001); *Shaw v. Miller,* 2001 WL 739241, at *2 n. 2 (E.D.N.Y. June 26, 2001); *Santana v. Artuz,* 2001 WL 474207, at *3–4 (S.D.N.Y. May 1, 2001).[4]

A minority of courts have expressed the test as whether " 'it is perfectly clear that the [petitioner] does not raise even a colorable federal claim,' in which case the Court should dismiss the unexhausted claim on the merits (or rather the clear lack thereof)." *Hernandez v. Lord,* 2000 WL 1010975 at *4–5 & n. 8 (S.D.N.Y. July 21, 2000) (internal quotations omitted; citing cases, and analyzing the diverging views without deciding which standard is appropriate); *accord, e.g., Padilla v. Keane,* 2000 WL 1774717 at *3 (S.D.N.Y. Dec.4, 2000); *Orraca v. Walker,* 53 F.Supp.2d 605, 611 (S.D.N.Y.1999); *see also, e.g., Basnight v. Keane,* 2001 WL 901139 at *5 n. 1 (E.D.N.Y. July 31, 2001) (articulating "nonmeritorious" standard rather than "patently frivolous," although claims failed either standard). Under either the "patently frivolous" or "nonmeritorious" standard, Lewis's ineffective assistance of counsel claims warrant dismissal. Therefore, the Court may consider Lewis's habeas petition in its entirety.

## II. Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor,* 529 U.S. 362, 375–76, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

## III. Merits of the Petition

### A. Ineffective assistance of trial counsel and appellate counsel

#### 1. Legal standard

In order to succeed on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("*Strickland* "), a habeas petitioner must satisfy a two-part test. First, he must show that his attorney's performance "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, and second, he must show that there is a "reasonable probability" that but for counsel's error, the outcome would have been different, *id.* at 694, 104 S.Ct. 2052.

██ Although the *Strickland* test was formulated in the context of evaluating the effectiveness of trial counsel, the same

---

4. Although the Second Circuit opted for the "patently frivolous" test in *Jones v. Senkowski,* 2001 WL 1230800, at *4 (2d Cir. Oct.5, 2001), that decision was later vacated and withdrawn, *Jones v. Senkowski,* 2002 WL 246451 (2d Cir. May 22, 2002), *amended by Jones v. Senkowski,* 42 Fed.Appx. 485, 2002 WL 1032589 (2d Cir. May 22, 2002), *cert. denied,*

537 U.S. 1177, 123 S.Ct. 1005, 154 L.Ed.2d 923 (2003). Some of the decisions in the "patently frivolous" line relied on *Jones. See, e.g., Acosta v. Couture,* 2003 WL 272052 (S.D.N.Y. Jan. 23, 2003); *Fernandez v. Artuz,* 2002 WL 977372, at *2 (S.D.N.Y. May 9, 2002); *Rowe v. New York,* 2002 WL 100633, at *5 (S.D.N.Y.Mar.4, 2002).

standard applies to claims regarding the performance of appellate counsel. *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir. 1994) (citing, *e.g., Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992)). Appellate counsel need not present every non-frivolous argument that could be made on petitioner's behalf. *Mayo,* 13 F.3d at 533; *see also Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (emphasizing that appellate counsel "need not advance every argument, regardless of merit, urged by the appellant"). Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's strategic choices. *Mayo,* 13 F.3d at 533; *see also Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the [ ] goal of vigorous and effective advocacy[.]"). However, a habeas petitioner may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing arguments that were patently and significantly weaker. *Mayo,* 13 F.3d at 533.

### 2. Counsels' alleged errors

### a. Failure of trial counsel to object to court's jurisdiction and failure of trial counsel to advise petitioner as to right to "veto" dual juries

Lewis first contends that trial counsel erroneously failed to contest the court's jurisdiction. He claims that "the Justice of the Monroe County Court[ ] had no lawful authority" to select dual juries, and therefore the court lacked jurisdiction to conduct his criminal trial. Next, Lewis complains that he was never asked if he waived his "statutory or constitutional right to a jury being selected under the mandates of C.P.L. 260.10; 260.20 and 260.30, or as secured under New York Constitution Article I section 6; and Article III section 2 Clause 3, and the 5th, 6th, and 14th Amendments of the United States Constitution." *See* Petition ("Pet.") at 6 (Docket # 1).

C.P.L. § 260.10 provides that "[e]xcept as otherwise provided in [C.P.L.] section 320.10, every trial of an indictment must be a jury trial." [5] In *People v. Ricardo B.,* 73 N.Y.2d 228, 538 N.Y.S.2d 796, 535 N.E.2d 1336 (1989), the New York Court of Appeals observed that "the right to trial by jury is guaranteed by both Federal and State Constitutions (U.S. Const. 6th Amend.; N.Y. Const., art I, § 2) and implemented by statute (CPL arts. 260, 270)." Moreover, that court observed, "[t]here is nothing in the Constitutions, the statutes or our decisions interpreting them, however, which expressly authorizes or prohibits the use of multiple juries in New York State." *Id.* The New York Court of Appeals has characterized trial by dual juries as a "modified form of severance" and has held that their use is "to be evaluated under standards for reviewing severance motions generally," *Ricardo B.,* 73 N.Y.2d at 233, 538 N.Y.S.2d 796, 535 N.E.2d 1336, which require a showing of prejudice to entitle a defendant to relief, *People v. Mahboubian,* 74 N.Y.2d 174, 183, 544 N.Y.S.2d 769, 543 N.E.2d 34 (1989); *accord, e.g., People v. Irizarry,* 83 N.Y.2d 557, 560–61, 611 N.Y.S.2d 807, 634 N.E.2d 179 (1994). In *Irizarry,* the Court

---

**5.** C.P.L. § 260.20, upon which Lewis relies, provides that "[a] defendant must be personally present during the trial of an indictment[.]" However, Lewis does not contend that he was prevented from being present at all times during his trial. C.P.L. § 260.30 sets forth the order in which jury trials are to be conducted. Lewis does not set forth any facts which would constitute a violation of this section.

of Appeals declined to construe *Ricardo B.* as articulating the minimum constitutional standards for a dual-jury trial, such that any departure therefrom would deprive the defendant of a fair trial and require reversal without regard to actual prejudice.

Prior to *voir dire,* Judge Marks informed the parties that, depending upon the outcome of Lewis's severance motion, she intended to utilize a double jury trial. Counsel for Freddie Glover objected; counsel for Lewis did not voice an objection. On June 3, 1996, after the completion of jury selection for defendant Glover, Judge Marks explained,

> I previously ruled that a severance is required based upon the interlocking confession. The most reasonable and fair way to proceed with a severance is a double jury trial. A triple jury trial would be ideal and [*sic*] everyone hearing the witnesses at the same time without having a delay. However, I believe that three juries are not as manageable and in providing fairness to everyone involved I believe all the rights can be safeguarded and a fair result by [*sic*] a double jury trial.
>
> There are twenty to twenty-five witnesses and 18 to 20 are witnesses in common to both Defendant's [*sic*] and I believe that the principal separating testimony is the interlocking confession and therefore I believe it would be very suitable for a double jury trial.

6/03/96 Tr. at 200–01.

As the New York Court of Appeals explained in *Ricardo B.* and its progeny, the decision as to whether to use dual juries is left to the trial court's discretion. Since nothing in New York state law or federal law prohibits the trial courts from utilizing dual juries, there was no colorable basis on which defense counsel could object to the court's jurisdiction. Defense counsel cannot be found inadequate based on the fail-

ure to advance a legally baseless argument.

Because Lewis has failed to prove that his defense counsel's performance was deficient—the first prong of the test for ineffective assistance of counsel—it is unnecessary to address the second prong of this standard, whether counsel's performance was prejudicial to the petitioner. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" to prevail on an ineffective assistance of counsel claim. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. This issue need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. 2052. Because Lewis has not established professionally unreasonable performance, his ineffective assistance of counsel claim on this ground must fail.

██ With regard to his claim that defense counsel never asked Lewis for written consent to the use of dual juries, Lewis has offered no state or federal precedent to support his proposition that a defendant is constitutionally entitled to "veto" the use of dual juries, and indeed I have found none. To the contrary, the use of dual juries is a matter left to the trial court's discretion, and the court is not obligated to obtain the defendant's consent.

██ Turning to his claim that defense counsel failed to explain the "constitutional protections relative to a jury being selected in accordance with the statute and constitutional mandates of law," I fail to see a claim of attorney incompetence in that allegation. Review of the transcript reveals

that Lewis was present with his counsel at sidebars during jury selection and that defense counsel consulted with him during the *voir dire*.

As to his claim that appellate counsel was deficient in failing to argue that the trial court's use of dual juries divested it of jurisdiction to hear Lewis's case, this claim, as discussed above, is wholly without any legal basis. Therefore, appellate counsel did not err in omitting this argument from his brief on direct appeal.

### 2. Failure to object to prejudicial jury selection

■ Lewis states that the manner in which the dual juries were selected "were prejudicial, totally lack a record being preserved, or sought during the appeal process to reflect constitutional safeguards." Trav. at 2 (Docket # 13). Lewis contends that once a prospective juror was excused for cause by either his counsel or co-defendant's counsel, that juror should have been permanently removed from the jury pool. Lewis reasons that his counsel and co-defendant's counsel "constituted a defense team" so that any rejection of a prospective juror for cause by either member of the defense team automatically relieved that person from jury duty "relative to the instant indictment." Pet. at 7 (Docket # 1).

At the outset, I note that Lewis's characterization of his counsel and Freddie Glover's counsel as a "defense team" is inaccurate. Once the trial court severed Lewis's case from that of Freddie Glover, the two men were no longer "co-defendants," and the attorneys representing them were not "co-counsel." The severance of the two cases meant that there were two separate trials taking place, although they were in the same courtroom at the same time, and portions of the witness testimony were heard simultaneously by the two juries. Because there

were two trial occurring, the fact that the prosecutor or one of the defense attorneys chose to exclude a prospective juror did not affect whether the other defense attorney decided to seat that person on his client's jury.

After reviewing the complete transcripts of the jury selection process for Freddie Glover's jury and Lewis's jury, I cannot find that any errors occurred during either *voir dire*. It does not appear that any of the jurors challenged for cause during the Glover *voir dire* were selected as jurors by Lewis's defense counsel. All of the jurors who were challenged by Lewis's defense counsel for cause ultimately were excused from the jury. With respect to the jury that finally was selected to hear Lewis's case, none of the jurors were seated over objection from Lewis's defense counsel. Lewis's defense counsel accurately identified and challenged for cause those individuals who expressed any type of personal bias that might prove unfavorable to Lewis. Upon my review of the record, I can discern no evidence of constitutional error or juror misconduct during the *voir dire*. Tellingly, Lewis has not argued that any of the jurors seated in fact were biased or incapable of being impartial. Nor has Lewis pointed to any alleged instances of juror misconduct during his trial. Indeed, I found no evidence of prejudice or impropriety during the jury selection process. Trial counsel and appellate counsel had no basis upon which to argue otherwise.

In sum, with respect to all of these claims, Lewis has alleged no error of state or federal law which his defense counsel or appellate counsel could have raised in the trial court or on appeal. The use of multiple juries is not contrary to state or federal constitutional principles. Of crucial importance is the fact that Lewis has not alleged how he was prejudiced by the use of dual juries at his trial. Furthermore,

Lewis has cited no authority for the proposition that the trial use of dual juries divested it of jurisdiction over his case. Lastly, Lewis has not alleged that biased individuals actually were empaneled on his jury, let alone that the jurors committed misconduct during trial.

Counsel cannot be found deficient for failing to raise these nonmeritorious arguments. Most importantly, Lewis has not shown that he has suffered any prejudice, which is a prerequisite to granting habeas relief on any ineffective assistance of counsel claim.

### 3. Failure to request probable cause hearing

Lewis contends that trial counsel failed "to prepare adequate moving papers to contest the unlawful arrest of Defendant, and declare that the alleged admission to be fruits of the poisonous tree doctrine." Pet. at 10 (Docket #1). According to Lewis, he was entitled to a *Dunaway* hearing to determine whether probable cause existed to arrest him. Defense counsel asked for a probable cause hearing, but the trial court denied the request, holding that counsel's motion papers were insufficient to place probable cause in issue. On direct appeal, appellate counsel argued that the trial court erred in failing to conduct a probable cause hearing based upon the allegations in his defendant's omnibus motion seeking a *Huntley* hearing.[6] The Fourth Department rejected that claim as waived due to counsel's failure to provide further factual allegations to the court regarding the basis for the hearing, despite the court's offer to allow him to do so.[7]

The Fourth Department went on to hold that "in any event," the evidence adduced at the *Huntley* hearing established that the police had probable cause to arrest Lewis. *Id.* (citations omitted). According to that court, the "evidence adduced at the *Huntley* hearing established that the police had probable cause to arrest defendant." *Id.* (citing *People v. Wise*, 46 N.Y.2d 321, 329–30, 413 N.Y.S.2d 334, 385 N.E.2d 1262 (1978)). The state court's rejection of this claim on the merits bears importantly on Lewis's ability to succeed on a related ineffective assistance of counsel claim.

 Evidence offered at the suppression hearing demonstrated that the arresting officers had knowledge of Lewis's presence at the murder scene prior to any custodial interrogation. ˇ Having spoken with several of the eyewitnesses to the happenings at 1009 Joseph Avenue, the officers possessed information as to the nature and extent of Lewis's involvement. "So long as the police are solicitous of an individual's rights, and carefully delimit the scope of the intrusion, a custodial detention predicated upon reasonable suspicion can hardly be termed 'unreasonable.'" *People v. Wise*, 46 N.Y.2d at 329–30, 413 N.Y.S.2d 334, 385 N.E.2d 1262 (citations omitted). On this record, then, it is apparent that had a *Dunaway* hearing been granted, probable cause to arrest Lewis would have been found. Because the claim was without merit and would not have succeeded if raised on appeal, Lewis suffered no actual prejudice as a result of trial counsel's failure to pursue the *Duna-*

---

6. Pursuant to *People v. Huntley*, 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), defendants in New York are entitled to a hearing to determine the voluntariness of their statements to the police.

7. Respondent claims that due to the Appellate Division's finding that counsel waived the claim that the trial court erred in not granting a probable cause hearing, the claim is procedurally defaulted. However, a review of Lewis's petition reveals that Lewis does not claim on habeas review, as he did on direct appeal, that the trial court erred in failing to grant a probable cause hearing. Respondent's procedural default argument therefore is moot.

*way* hearing or appellate counsel's failure to argue that trial counsel's omission was evidence of incompetence.

## C. Insufficiency of evidence on intent

▇ Lewis argues that there was insufficient proof that he acted with the same intent as co-defendant Freddie Grover to warrant his conviction on the charge of felony murder. On direct appeal, the Fourth Department held that the claim was unpreserved for review and, in any event, without merit.[8] *People v. Lewis,* 278 A.D.2d at 820, 719 N.Y.S.2d 433 (citations omitted).

Lewis contends that the evidence at trial was insufficient to permit the inference that he had formed an intent to rob the victim's and to establish, therefore, that the killing of Shawn Hart was felony murder. Lewis urges that "[m]ere presence at or near a crime scene is insufficient proof that Defendant shared or acted with the same requisite intent to commit a crime." Pet. at 12 (Docket # 1). Furthermore, he asserts, "[t]he testimonies of the eyewitnesses never established that Defendant stole anything[,] [and][t]here was never any one to identify Defendant as being an active participant to any crime." *Id.* Without any analysis of the proof offered by the prosecution, respondent merely asserts that Lewis's "intent was a question of fact for the jury to decide."

New York's felony-murder statute provides, in pertinent part, that "[a] person is guilty of murder in the second degree when: ... [a]cting either alone or with one or more other persons, he commits or attempts to commit robbery ..., and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants...." N.Y. Penal Law § 125.25(3). In evaluating Lewis's claim that the prosecution's evidence was insufficient to establish the crime of attempted robbery because there was no evidence of an intent to rob, a federal habeas court is required to consider the trial evidence in the light most favorable to the state, upholding the conviction if "*any* rational trier of fact" could have concluded beyond a reasonable doubt that Lewis had the required intent. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). In reviewing a challenge to the sufficiency of the evidence, the court must "view the evidence, whether direct or circumstantial, in the light most favorable to the government and credit every inference that could have been drawn in its favor." *United States v. Lopez,* 372 F.3d 86, 89 (2d Cir. 2004) (quotations omitted). The reviewing court is charged with assessing the evidence "not in isolation but in conjunction ... and the convictions must be affirmed, so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *Id.* (quotations omitted); *see also Jackson v.*

---

**8.** Respondent states that "[a]s a threshold consideration, the Fourth Department determined that the petitioner failed to preserve [this claim] for appellate review[.]" Resp. Ans. at 14 (Docket # 6). Respondent then addresses, in a cursory fashion, the merits of Lewis's insufficiency claim. Respondent does not argue that the state court's finding that the claim was unpreserved created a procedural default. Thus, respondent has waived the affirmative defense of procedural default,

and I may consider this claim on the merits. *See Larrea v. Bennett,* 2002 WL 1173564, at *12 n. 15 (S.D.N.Y. May 31, 2002) (citing *Hooks v. Ward,* 184 F.3d 1206, 1216 (10th Cir.1999)) ("[S]tate-court procedural default ... is an affirmative defense, and [ ] the state is 'obligated to raise procedural default as a defense or lose the right to assert the defense thereafter.'") (quoting *Gray v. Netherland,* 518 U.S. 152, 165–66, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996)).

*Virginia,* 443 U.S. at 319, 99 S.Ct. 2781. As the Second Circuit has observed, federal court is not a forum for redetermining the outcome of a state criminal trial. *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999), *cert. denied,* 528 U.S. 1170, 120 S.Ct. 1196, 145 L.Ed.2d 1100 (2000).

■■■ It is true that two of the victims, Jose Rivera and Willie Randle, testified that they could not identify any of the perpetrators. Jennifer Sarquist, the victim's girlfriend, only could positively identify Freddie Glover as the man who shot her boyfriend. However, Lewis's own description of the events of November 28, taken in the light most favorable to the prosecution, is sufficient to support the inference that he intended to assist in robbing Shawn Hart. In his oral statements to the police, Lewis explained that Fred and Shawn Glover mentioned that they were going to a "weed house" Joseph Avenue to get some money that Fred believed was owed to him. Lewis admitted to the police that the Glovers planned to go to the "weed house" to rob the occupants of drugs and money, and that he went with the Glovers to help with the robbery. Lewis informed the police that he expected to receive some drugs and money in exchange for his participation in the robbery, although he and the Glovers did not agree in advance on what the amount of his cut would be. Lewis stated that when they arrived, he went to the front door and began negotiating with a man inside the house so that the Glovers could gain entrance. Fred Glover, armed with a sawed-off shotgun, and Shawn Glover, with a small handgun, then rushed the door. Lewis observed Fred Gloever shoot a man and Shawn Glover fire his gun into the ceiling. During the robbery, Lewis admitted picking up a pager belonging to one of the victim that had fallen to the floor. Lewis's statements constituted sufficient evidence upon which a rational fact finder could find that the prosecution established,

beyond a reasonable doubt, that Lewis formed the intent to commit robbery and therefore was guilty of felony murder.

### D. Failure to preclude certain identification evidence

Lewis contends that the trial court erred in failing to preclude identification evidence for which the defense was not given notice pursuant to C.P.L. § 710.30 prior to trial. At trial, Lewis's arresting officer was permitted to make an in-court identification of Lewis after having a viewed a photograph of him approximately ten day before trial. Defense counsel argued that the identification was suggestive, but the trial court ruled that the identification was merely confirmatory in nature. On direct appeal, the Fourth Department held that the viewing of the photograph by the police officer prior to trial " 'constituted trial preparation, not an identification procedure.'" *People v. Lewis,* 278 A.D.2d at 820, 719 N.Y.S.2d 433 (quoting *People v. Glover,* 266 A.D.2d 862, 863, 698 N.Y.S.2d 185 (4th Dept.1999)).

■■■ Federal habeas relief does not lie for alleged errors of state procedural or substantive law, unless such errors violate the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254; *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Lewis here asserts that the prosecution failed to comply with C.P.L. § 710.30 which provides, in pertinent part, that whenever the People intend to offer "testimony regarding an observation of the defendant ... to be given by a witness who has previously identified him as such, they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered." C.P.L. § 710.30(1)(b). Statutory notice

under C.P.L. § 710.30 is only necessary if the police or prosecutor arrange the confrontation or photographic array for the purpose of establishing identity. *See, e.g., People v. Gissendanner*, 48 N.Y.2d 543, 552–53, 423 N.Y.S.2d 893, 399 N.E.2d 924 (1979) (in-court identifications by officers, each of whom also had occasion to see defendant on date of her arrest, were properly received, despite district attorney's failure to serve pretrial notice, where neither officer had previously identified defendant within intendment of governing statute); *People v. Herner*, 85 N.Y.2d 877, 879, 626 N.Y.S.2d 54, 649 N.E.2d 1198 (1995) (same). Here, the police officer who identified Lewis at trial arrived at the scene of the crime and saw Lewis jump out of a window at the victim's house and flee on foot. The officer then pursued Lewis and apprehended him, at which time he had ample opportunity to see him. Trial Tr. at 428–39. Therefore, the notice provision of C.P.L. § 710.30 did not apply. Absent any error or misapplication of state law, let alone federal constitutional law, habeas relief is not warranted on this claim.

### E. Failure to impose concurrent sentences

Lastly, Lewis contends that the trial court erred in directing that counts three and four of the indictment-the Hart robbery and the Randle robbery-run consecutively to the sentence for the felony murder charge. On direct appeal, the Fourth Department held that "because defendant was convicted in connection with the robbery of two victims, the court properly directed that the concurrent sentences imposed on counts two and three be consecutive to the concurrent sentences imposed on counts four and five[.]" *People v. Lewis*, 278 A.D.2d at 820, 719 N.Y.S.2d 433 (citations omitted).

The assertion that a judge abused his or her discretion in sentencing generally is not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977) (citing *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)). "No federal constitutional issue is presented where … the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992). New York Penal Law § 70.25 provides that concurrent sentences must be imposed

> [w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other.

N.Y. Penal Law § 70.25(2). Here, however, the robbery convictions for which consecutive sentences were imposed involved different victims and two discrete acts of robbery: Randle was robbed in a different part of the house after Hart was shot and killed. (*See* Trial Tr. at 147–67; 330–39; Sentencing Tr. at 14–15). Although the two robberies may be described as having occurred during the course of a single extended criminal transaction, namely, the home invasion at 1009 Joseph Avenue, there clearly were two separate acts that resulted in the theft of money from Hart and of money and personal property from Randle. Thus, the trial court properly exercised its discretion under Penal Law § 70.25 in issuing consecutive sentences to Lewis on the two robbery counts. This claim is not a proper basis for habeas relief.

### CONCLUSION

For the reasons stated above, Eli Lewis's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied,

and the petition is dismissed. Because Lewis has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. 28 U.S.C. § 2253. Further, I certify that any appeal from this order would not be taken in good faith. *See* 28 U.S.C. § 1915(a); *Coppedge v. United States*, 369 U.S. 438, 444, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

IT IS SO ORDERED.