People v Mandujano (2025 NY Slip Op 50311(U))

[*1]

People v Mandujano

2025 NY Slip Op 50311(U)

Decided on March 10, 2025

Criminal Court Of The City Of New York, Kings County

Glick, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 10, 2025
Criminal Court of the City of New York, Kings County

The People of the State of New York

against
Carlos Aguilar Mandujano, Defendant.

Docket No. CR-003341-24KN

Prosecution: Kings County District Attorney's Office by ADA Timothy Malloy
Defendant: Brooklyn Defender Services by Lilian Giacoma, Esq.

Joshua Glick, J.

Defendant is charged with V.T.L. §§ 1192(3) and 1192(1), Operating a Vehicle While Under the Influence of Alcohol or Drugs in connection with an incident that allegedly occurred on January 23, 2024.
Defendant moves to suppress noticed statements, physical evidence, evidence of his refusal to submit to chemical testing, police observations, video recordings, photographs, and all other fruits of his arrest.
The Prosecution opposes.
On February 4, 2025, the Court conducted a combined Dunaway, Huntley, Mapp, and Refusal hearing. The Prosecution presented one witness at the hearing, Police Officer Jonathan O'Neil. The Prosecution admitted into evidence Officer O'Neil's body-worn camera footage (BWC) and video from the Intoxicated Driver Testing Unit (IDTU) at the 78th Precinct of the New York Police Department (NYPD). Defendant did not present any witnesses or admit any evidence. After testimony was concluded, both parties made oral arguments.
The Court now makes the following findings of fact and conclusions of law.
 FINDINGS OF FACT
The Court finds as fact all events depicted in the videos admitted into evidence. The Court also credits the testimony of Officer O'Neil to the extent set forth below and makes the following specific findings of fact.
Officer Jonathan O'Neil has been employed by the Port Authority Police Department since June 2016. He is assigned to Special Operations doing commercial vehicle inspections. He received training at the Police Academy but has not received any specialized training in identifying intoxicated drivers. During his career, Officer O'Neil has made between twenty-five and thirty arrests, approximately five of which were for suspected intoxicated driving. He has participated in approximately fifteen to twenty arrests for suspected intoxicated driving.
On January 23, 2024, Officer O'Neil was working at John F. Kennedy Airport on the 2:00 p.m. to 10:00 p.m. shift. After his assigned detail, Officer O'Neil got in a marked police cruiser with his partner, Officer Timothy Mui and drove west on the Belt Parkway. Both officers were in [*2]uniform equipped with BWC. Around 10:35 p.m., they encountered a traffic jam caused by a four- or five-vehicle accident at 1730 Shore Parkway in Kings County. The officers got out of their car and were checking for injuries when a tow truck driver signaled to Officer O'Neil that the driver of a truck ahead was intoxicated. The tow truck driver pointed, but did not verbally clarify about whom he spoke. Officer O'Neil did not ask him for his name, contact information, or for any further details. From his vantage, Officer O'Neil could not see the front of the truck ahead; he thought it may have been involved in the collision. Officer O'Neil testified that he took the tow truck driver's statement "with a grain of salt." However, Officer O'Neil's actions soon after the interaction belie this statement.
Officer O'Neil approached the truck, a white Ford F-150, which was parked on the side of the highway, where he found Defendant seated behind the wheel with his seatbelt fastened and window closed. Defendant had his foot on the brake and the truck was stationary, but the keys were in the ignition, engine was running, and the truck was in drive. Officer O'Neil immediately told Defendant to turn the vehicle off, opened the door, reached inside, turned off the ignition, and removed the keys. Officer O'Neil took Defendant's keys within the first minute of their encounter and never returned them. He asked if Defendant had been involved in the collision, which Defendant denied. Defendant's vehicle had no apparent damage and was stopped several yards ahead of the collision. Within the first few minutes of the encounter, Officer O'Neil told Defendant to stay put and not to move several times. Defendant complied. Officer O'Neil also requested Defendant's license, which Defendant turned over with proof of insurance. Officer O'Neil did not return them. Defendant asked repeatedly if he could leave, and each time Officer O'Neil refused.
During their interaction, Officer O'Neil and Defendant were at eye level. Defendant spoke with a thick accent and struggled to form complete sentences in English, which made it difficult for Officer O'Neil to understand him. Defendant told Officer O'Neil he had called the police and was trying to help. Officer O'Neil observed Defendant to have watery, bloodshot eyes and the odor of alcohol on his breath. He also observed two green bottles with "Heineken" written in white lettering in the dashboard-mounted center console, situated below the driver's seat on Defendant's right side. The tops of the bottles were level with the bottom of the driver's seat.
At some point early in his interaction with Defendant, Officer O'Neil requested assistance from the NYPD. Officers from the 62nd Precinct of the NYPD arrived around 12:20 a.m. Officer O'Neil shared his impression that Defendant was intoxicated. The NYPD officers approached Defendant, asked him a few questions, then ordered him out of the truck. They asked him if he had been drinking that night and how much. Defendant responded that he had consumed three or four beers. The officers handcuffed Defendant and took him to the IDTU at the 78th Precinct. Officer O'Neil accompanied them.
At 1:13 a.m., Defendant and Officer O'Neil arrived at the IDTU and were joined by NYPD Officer Justin DeSimone. At 1:55 a.m., Officer DeSimone asked Defendant if he was willing to take a breathalyzer test in English, then played a video that was ostensibly a Spanish translation of the same. Defendant said no. Officer DeSimone explained the consequences of refusing to take the test in English, and again played a video that was ostensibly a Spanish translation. He asked again if Defendant would take the test and again played the video. Defendant again said no.

CONCLUSIONS OF LAW
At a suppression hearing, the prosecution has the burden of going forward to show, by credible evidence, the lawfulness of the police conduct (People v Hernandez, 40 AD3d 777 [2007]; see also People v Berrios, 28 NY2d 361 [1971]; People v Wise, 46 NY2d 321 [1978]). To evaluate the police conduct, the Court must determine whether it was justified at its inception and whether it was reasonably related in scope to the circumstances at the time (People v DeBour, 40 NY2d 210 [1976]). If the prosecution satisfies the initial burden of going forward, the defendant "bears the ultimate burden of proving that the evidence should not be used against him" (People v Berrios, 28 NY2d at 367).
The Court of Appeals has established a four-tiered method for evaluating the propriety of police-initiated street encounters (People v DeBour, 40 NY2d at 223). Level one allows the police to request information based on an objective, credible reason, not necessarily indicative of criminality (id.). Level one requests for information include only basic, nonthreatening questions, such as identity, address, or destination (People v Hollman, 79 NY2d 181, 185 [1992]). Level two is the common-law right of inquiry based on a founded suspicion that criminal activity is afoot (DeBour at 223). Pointed questions that would lead the person approached to reasonably believe he or she is suspected of some wrongdoing require level two suspicion (People v Hollman, 79 NY2d at 185). Level three authorizes the police to forcibly stop and detain a person if the police have a reasonable suspicion that the person was involved in a crime (DeBour at 223). Finally, level four permits police to arrest a person based on probable cause that he or she has committed a crime (id.). 
Level one suspicion permits an officer to approach a parked vehicle (People v Eugenio, 185 AD3d 1050, 1051 [2020]). However, where police approach an already-parked vehicle, confining a person to the vehicle and not allowing him to leave is the constitutional equivalent of a forcible stop and must be supported by reasonable suspicion that the person has committed, is committing, or is about to commit an offense (People v Harrison, 57 NY2d 470 [1982]). "Reasonable suspicion requires the quantum of knowledge necessary to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (People v Larkin, 62 Misc 3d 62, 66 [2018] [internal quotations omitted]). 
When Officer O'Neil approached Defendant's vehicle, it was already stopped on the side of the highway. This was a level one encounter requiring an objective, credible reason not necessarily indicative of criminality for the officer to approach (People v Harrison, 57 NY2d 470; People v Karagoz, 143 AD3d 912 [2016]). Officer O'Neil had observed the aftermath of a multivehicle accident moments earlier and noticed Defendant's truck stopped several yards ahead. While checking for injuries, he considered that Defendant may have been involved in the collision (see generally People v Brown, 42 NY3d 270 [2024] [noting that the community caretaking doctrine permits minor police intrusions as needed for them to assist drivers whose vehicles become disabled for reasons totally divorced from criminality]). These circumstances provided an objective, credible reason for Officer O'Neil to approach Defendant's vehicle (People v Valerio, 274 AD2d 950 [2000]).
Within seconds of reaching Defendant's truck, Officer O'Neil opened the door and removed Defendant's keys. This action escalated the encounter to a forcible stop requiring level three suspicion (People v Noble, 154 AD3d 883, 884 [2017] [finding that a police officer reaching into the defendant's vehicle and turning off the ignition was a forcible stop requiring reasonable suspicion that an individual is committing, has committed, or is about to commit a [*3]crime]). However, nothing before the Court evinces such heightened suspicion before Officer O'Neil effectuated the seizure. Officer O'Neil did not observe any damage to Defendant's vehicle to suggest he had been involved in the accident. He did not instruct Defendant to open his window or ask him any questions. Although Officer O'Neil testified that Defendant had odor of alcohol on his breath, he could not possibly have made this observation through Defendant's closed window.[FN1]
 While it is possible that Officer O'Neil could have seen the two beer bottles through the closed window, he did not testify to seeing them before opening the door of the truck. Moreover, Officer O'Neil never testified about the condition of the bottles, such as whether they were open or closed, or empty or full. Defendant made no attempt to flee the scene; Officer O'Neil testified that he never saw Defendant's vehicle move, and that Defendant never got out of the truck during the nearly two hours it took NYPD to arrive. There is no indication that Defendant presented any safety risk; indeed, Officer O'Neil's BWC depicts him standing next to and casually speaking with Defendant for a significant stretch. In short, Officer O'Neil did not observe or discover anything amounting to reasonable suspicion before seizing Defendant. Thus, Officer O'Neil acted unlawfully when he opened Defendant's door and took his keys.
Although the fruit of the poisonous tree doctrine generally renders evidence inadmissible when it is obtained by means of illegal police conduct, the exclusion is inapplicable "if the impact of the illegal arrest does not closely touch upon the challenged evidence" (People v Rogers, 52 NY2d 527, 532 [1981]). Sufficient attenuation between the police action and the evidence can overcome the taint of the original illegality (United States v Crews, 445 U.S. 463, 471 [1980]). Attenuation may be sufficient "where the evidence challenged was the product of a source independent of the defendant's detention; and where the discovery of the challenged evidence was attenuated from the illegal activity by a significant intervening event which [justifies] the conclusion that that evidence was not the product of the illegal activity" (People v Rogers, 52 NY2d at 533). The question boils down to whether the evidence was obtained by exploiting the illegality or by some sufficiently distinguishable means (Brown v Illinois, 422 U.S. 590 [1975]).
No such attenuation exists here. After Officer O'Neil took Defendant's keys, he kept him continuously confined to his vehicle for nearly two hours. O'Neil and Defendant remained in the same location, with Defendant seated in the driver's seat of his vehicle and Officer O'Neil outside. For most of the time, Officer O'Neil stood next to the vehicle, but occasionally stepped a few paces behind it. The circumstances were constant for the full duration of the stop. Officer [*4]O'Neil's observations of Defendant's eyes and breath, as well as the bottles in the center console occurred under these circumstances, during the unlawful detention. When officers from the NYPD's 62nd Precinct arrived, they approached Defendant still seated in his vehicle and asked whether he had been drinking and how much without first administering Miranda warnings. From there, Defendant was transported directly to the IDTU at the 78th Precinct. Accordingly, all evidence obtained by the police following their unlawful conduct, including police observations, Defendant's statements, and the bottles in Defendant's truck must be suppressed (People v Newson, 155 AD3d 768 [2017]).
Although evidence of Defendant's refusal to submit to chemical testing must also be suppressed as fruit of the poisonous tree, it is also inadmissible because it occurred more than two hours after his arrest (VTL §1194[2][b][1]; People v Odom, 31 NY3d 344 [2018]). VTL §§ 1194 and 1195 govern the admissibility of chemical testing or the voluntary refusal to submit thereto, including a provision that such testing or refusal thereof should occur within two hours of arrest (People v Atkins, 85 NY2d 1007 [1995]). Although Defendant was not handcuffed until 12:20 a.m., he was in custody and not free to leave from the moment Officer O'Neil took his keys and forbade him from leaving (People v Paulman, 5 NY3d 122, 129 [2005] [holding that the standard for determining whether a person was in custody "is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave"]). Thus, Defendant was in custody for purposes of the two-hour rule beginning at approximately 10:37 p.m. The first time he was offered a chemical test occurred at 1:55 a.m., more than three hours later. Accordingly, evidence of Defendant's refusal is inadmissible.

CONCLUSION
For the reasons described above, Defendant's motion to suppress is GRANTED in its entirety.
This constitutes the decision and order of the Court.
Dated: March 10, 2025
Hon. Joshua Glick

Footnotes

Footnote 1:As for the tip from the unidentified tow truck driver, the information was not sufficiently reliable to escalate Officer O'Neil's level of suspicion (cf. People v Taggart, 20 NY2d 335 [1967]; People v Arthurs, 24 NY2d 688 [1969]). The unidentified tow truck driver told Officer O'Neil that the driver of a truck ahead was intoxicated, but did not specify about whom he spoke. Even assuming Officer O'Neil was certain he meant Defendant, the tow truck driver did not provide any corroborating information, such as observations of Defendant's manner of driving or physical indicators. The tow truck driver did not even state that he had personally observed Defendant to be intoxicated. He merely provided a conclusory suggestion. This anonymous report was baldly insufficient to justify heightened suspicion (cf. People v Hart, 4 Misc 3d 105 [2004]).