People v Nembhard (2025 NY Slip Op 51778(U))

[*1]

People v Nembhard

2025 NY Slip Op 51778(U)

Decided on November 10, 2025

Supreme Court, Bronx County

Bowen, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 10, 2025
Supreme Court, Bronx County

The People of the State of New York

against
Michael Nembhard, Defendant.

Ind. No. 070571-24

Jordyn Fleisher and Paul Irace, Assistant District Attorneys, Bronx County, for the People 
Barry Krinsky, P.C., for Defendant

E. Deronn Bowen, J.

Summary
1. The defense suppression motion is GRANTED to the extent of suppressing the entirety of defendant's interrogation; all other defense suppression applications are DENIED.
2. The court HOLDS that portions of defendant's interrogation may be used for impeachment purposes in accordance with this decision and order.
I. Background and Suppression Hearing Evidence
Defendant stands charged in an indictment with attempted murder in the second degree (Penal Law §§ 110/125.25 [1]), criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]), reckless endangerment in the second degree (Penal Law § 120.20) and other related charges. Defendant moved in various branches of an omnibus motion dated March 26, 2024, to, inter alia, suppress fruits of his observation, seizure and arrest by the police, including all "statements allegedly obtained from him by police officers or other public officials." On July 29, 2025, a Dunaway/Huntley/Wade hearing was held before the court to address defendant's suppression claims.[FN1]
 Detective Robert Konner, a 20-year NYPD veteran, was the sole prosecution witness to testify at the hearing; the defense elected to not present any evidence. After a review of the hearing testimony and other evidence, and the parties' respective post-hearing submissions (defense briefing dated September 11, 2025; the People's response dated October 6, 2025), the Court finds Det. Konner to be credible and makes the following findings [*2]of fact.
When Det. Konner came on duty at 9 a.m. on October 8, 2023, he "was notified there was a 'shots fired' case at 229[th Street] and White Plains Road" in Bronx County, NY. The detective, who was assigned as the lead investigator, "got a vehicle and went over to the location myself . . . [,] and when I got there, I observed five shell casings." In the course of the investigation, the detective "learned that a 911 caller stated that an individual fired gunshots on that corner and walked south on White Plains Road going towards 228th Street." Det. Konner collected video surveillance footage that captured the shooting and the suspected shooter. "I took still shots of the face, and I sent it to our face recognition unit . . . . [I]t came back as a match to [defendant]."
Det. Konner later "learned that my suspect [defendant] was actually arrested on a different matter." Namely, the shell casings recovered from the instant October 8, 2023, shooting were determined to be a ballistics match for a separate shooting "incident in the 49 Precinct [ ] on January 14th, after my incident." Defendant had been arrested and charged with possessing the firearm that was discharged on January 14, 2024. Det. Konner met with the arresting officer on that matter to "review a photo and review video in which [that officer] identified [defendant]. . . . With all the facts in my case, I created—I changed the suspect I-Card into a PC [probable cause] I-Card. And, when I do that Bronx Warrants gets notified, and they take over the case of the apprehension."
In the early-morning hours of February 5, 2024, the NYPD Warrant Squad apprehended defendant at his home. There is no evidence that any communication material to the suppression hearing occurred during defendant's arrest and transport to the 47th Precinct interrogation room, where he met later the same day with Det. Konner and another detective, Det. Charles Gove. A videorecording of the interrogation, conducted after defendant was unhandcuffed, was entered into evidence and played for the court. The interrogation began with Det. Konner explaining to defendant his Miranda rights. Following instruction on the usual Miranda points, and receiving affirmative responses from defendant that he understood each, Det. Konner—instead of requesting defendant's consent to the interrogation—declared affirmatively, "Now that I've read you your rights, I just want [to] ask you some questions. I think the most important thing is, probably, do you understand why you're here?" Defendant responded, "No."
The interrogation continued in earnest for a little over two minutes. Then, the following exchange took place.
"[DET. KONNER]: But, do you see yourself in the picture, right?
[DEFENDANT]: Yes, I see myself.
[DET. KONNER]: Alright, these are from the October incident. Okay, I'm going to be straight with you, alright, I know that the girl and the guy you were arguing with followed you and and instigated you, right right [sic]? So, you know that, to be honest with you, you discharged a firearm, alright? That—I don't think it had intent[ ] to hurt them [sic]. I think it's just that you wanted [them to] leave you alone because they had been following you. Am I right or wrong? There's two types of things: Is there an intent that you were going to hurt people or was it that you just wanted [them] to leave you alone because they were following you?
[DEFENDANT]: Alright at this point I—I think I might need a lawyer. [DET. KONNER]: That's fine. If that's what you want, it's up to you.
[DEFENDANT]: Another mess now, again.
[DET. KONNER]: Okay, alright so, that—that's fine. So, let me just explain the charges okay. So, in this case, you've been, since—I don't know. And, you asked—and you want to speak to a lawyer, which is fine. We are charging you with attempted murder, right? That doesn't mean what the DA's going to keep [sic]. Because, we don't—I don't [know] if you had intent to hurt these people or not. That's what I was trying to ask you. Umm, so, if that's the case, then you got nothing to worry about. Alright, then it will then just be for the reckless endangerment.
[DEFENDANT]: Come again? You charging me with attempt murder?
[DET. KONNER]: Well, there's two people that you pointed a gun at, and you fired.
[DEFENDANT]: I did not point any gun at them.
[DET. KONNER]: Alright, I'm not going to argue with you. I'm just telling you what the charges are, okay?
[DET. GOVE]: I need you to listen really quickly. You requested an attorney. We are going to respect and honor that, but there is only so much right now that we can tell you. I'm not going to ask you any further questions. I'm just going to alert you of some things that's going to happen today."
No further evidentiary communication occurred between defendant and the detectives after that point in the interrogation.
II. Analysis
A. Dunaway and Wade Points
The People have satisfied their "burden of going forward to show the legality of the police conduct in the first instance" (People v Di Stefano, 38 NY2d 640, 652 [1976]; see People v Wise, 46 NY2d 321, 329 [1978] ["That the People bear the burden of going forward to justify police activity, such as an arrest or a custodial interrogation, once it is challenged by defendant is too basic to dispute"]). Det. Konner established defendant's identity as the probable shooter through a series of lawful and reasonable investigative steps, including review of surveillance video footage, use of facial recognition analysis, following up on a ballistics-match lead, and obtaining a police officer's identification of defendant based upon prior contact. Accordingly, the arrest was based upon reasonable cause, and defendant's Dunaway and Wade suppression applications are DENIED (see Dunaway v New York, 442 US 200 [1979]; United States v Wade, 388 US 218 [1967]). 
B. Huntley Point
1. Miranda Sub-Point
"To prove a valid [Miranda] waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right" (United States v Jaswal, 47 F3d 539, 542 [2d Cir 1995]; see Moran v Burbine, 475 US 412, 421 [1986]). Thus, "[t]o be valid, an accused's waiver of his or her rights must be knowingly and intelligently made. This is essentially a factual issue that must be determined according to the circumstances of each case" (People v Williams, 62 NY2d 285, 288 [1984] [citation omitted]; see United States v Spencer, 995 F2d 10, 11 [2d Cir 1993] ["The question of [Miranda] waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused"]; People v Santos, 112 AD3d 757, 758 [2013] ["Whether a defendant knowingly and intelligently waived his or her rights to remain silent and to an attorney is determined upon an inquiry into the totality of the circumstances [*3]surrounding the interrogation"] [internal quotation marks omitted]).
No evidence or allegations were presented of unlawful actions by law enforcement during defendant's seizure, arrest and transport to the precinct. From the interrogation videorecording, it is clear that, prior to questioning defendant, Det. Konner ensured his "full awareness of the [Miranda] right being waived and of the consequences" thereto (Jaswal, 47 F3d at 542). However, defendant's voluntariness to the interrogation was not established. Rather than asking defendant whether he wished to waive his rights and speak, the detective immediately stated, "Now that I've read you your rights, I just want to ask you some questions." The detective then began asking—and receiving answers from defendant to—plainly incriminatory questions such as "Do you understand why you're here?" and "Do you see yourself in the picture?"
Granted, Det. Konner was not overtly coercive or threatening during his questioning of defendant, and his failure to obtain defendant's explicit consent to the interrogation does not appear to have been in any way intentional or malicious. This does not negate the lack of voluntariness, though, as there is no "niceness" or "oopsie" exception for the Miranda violation (see People v Gonzalez, 39 NY2d 122, 128 [1976] ["Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle"]). Defendant's unrequested, unvolunteered and wholly assumed "consent" to participate in the precinct interrogation—only hours after having been arrested without notice in his home in the early morning; handcuffed; transported involuntarily to an NYPD precinct; and placed in a windowless interrogation room with two detectives and without counsel—cannot reasonably be viewed as voluntary (id. ["Custody, or, more compellingly, the immediate events of an arrest, . . . do, however, engender an atmosphere of authority ordinarily contradictory of a capacity to exercise a free and unconstrained will"]). Accordingly, defendant's Huntley application to suppress the entirety of the precinct interrogation is GRANTED (see People v Huntley, 15 NY2d 72 [1965]).
2. Right-to-Counsel Sub-Point
Defendant has asserted separately in his suppression application that his continued interrogation after having declared, "I think I might need a lawyer," constituted a violation of his right to counsel. Under the federal standard, the right-to-counsel analysis
"is an objective inquiry. . . ."
. . . . Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [the Sixth Amendment] does not require that the officers stop questioning the suspect. . . .
. . . .
We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. Full comprehension of the rights to remain silent and request an attorney is sufficient to dispel whatever coercion is inherent in the interrogation process. A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although . . . if a suspect subsequently requests an [*4]attorney, questioning must cease[,] it is one that must be affirmatively invoked by the suspect" (Davis v United States, 512 US 452, 459-461 [1994] [internal quotation marks and brackets omitted]).
Immediately following the presentation of hearing evidence, the court expressed quite pointed skepticism over whether defendant's statement constituted a clear, unequivocal invocation of the right to counsel in satisfaction of the federal standard. However, the New York state standard is not so constricted.
"In New York, the right to counsel is grounded on this State's constitutional and statutory guarantees of the privilege against self-incrimination, the right to the assistance of counsel and due process of law. It extends well beyond the right to counsel afforded by the Sixth Amendment of the United States Constitution and other State Constitutions" (People v Davis, 75 NY2d 517, 521 [1990] [citations omitted]).
Under the "extend[ed]" New York State standard, if, for example,
"the only evidence [is] defendant's words 'I think I need an attorney,' coupled with the interviewing officer's notation that defendant was 'asking for an attorney[,] [this] demonstrates an unequivocal invocation of defendant's right to counsel. This is not to say that utterance of the words defendant used would unequivocally invoke the right to counsel in every instance. But on this record, where there were no additional facts upon which a contrary inference could be drawn, further inquiry by the police was not permitted. Defendant's confession, made after police questioning continued, must therefore be suppressed" (People v Porter, 9 NY3d 966, 967 [2007]).
Here, both detectives in the interrogation room verbally confirmed that, to their minds, defendant's words, "I think I might need a lawyer," conveyed an unequivocal request for counsel. Det. Konner responded, "[Y]ou want to speak to a lawyer, which is fine." Det. Gove said, "You requested an attorney. We are going to respect and honor that." As no contrary inference can be drawn, the court HOLDS, on these facts, under the New York State Constitution, that defendant's statement, "I think I might need a lawyer," constituted an unequivocal invocation of the indelible right to counsel. Accordingly, defendant's Huntley application to suppress his interrogation statements made after the invocation—already suppressed on the Miranda ground—is GRANTED on the right-to-counsel ground also.
3. Impeachment
"[T]he United States Supreme Court held that a statement obtained in violation of any aspect of a defendant's Miranda rights, although not admissible as evidence-in-chief, may be used to impeach a defendant who chooses to take the stand and whose testimony is inconsistent with his illegally obtained statement. We [the Court of Appeals] have permitted the use of illegally obtained evidence for that purpose also" (People v Maerling, 64 NY2d 134, 140 [1984]; see People v Wise, 46 NY2d 321, 324 [1978] ["We hold that a statement taken in violation of the Miranda rule may properly be used to impeach a defendant's credibility where the statement tends to prove a version of the facts contrary to that given in the defendant's trial testimony"]). Accordingly, the court HOLDS that, should defendant elect to testify on his own behalf at trial, the portion of the interrogation preceding his statement "I think I might need a lawyer" may be used against him for impeachment purposes.
The "Miranda versus right to counsel" analytical distinction is important because, unlike with a Miranda violation, statements obtained in violation of the right to counsel may be used for impeachment purposes only if they were obtained voluntarily (see Maerling, 64 NY2d at [*5]140). The court has determined that the voluntariness of defendant's entire interrogation is insufficiently demonstrated (see II.B.1 ante). Accordingly, the court HOLDS that defendant's invocation of the right to counsel and the statements he made thereafter—namely, "Alright at this point I—I think I might need a lawyer" ; "Come again? You charging me with attempt murder?" ; and "I did not point any gun at them"—may not be used for impeachment purposes.
Defendant's statement "Another mess now again," also made after the right to counsel had attached, requires separate treatment. This was a spontaneous admission "because the officer did nothing that was reasonably likely to elicit [that] incriminating response" (People v Ortega, 202 AD3d 489, 490 [2022] [internal quotation marks omitted]). Accordingly, the court HOLDS that the spontaneous statement "Another mess now again," although suppressed due to the Miranda and right-to-counsel violations that preceded it, may be used for impeachment purposes.
III. Conclusion
The entirety of defendant's interrogation is ORDERED suppressed. Nothing in this decision prevents the People from using the interrogation for impeachment purposes,[FN2]
 excepting defendant's three statements: (1) "Alright at this point I—I think I might need a lawyer" ; (2) "Come again? You charging me with attempt murder?" ; and (3) "I did not point any gun at them." These three statements are suppressed and may not be used for impeachment purposes.
THIS CONSTITUTES THE DECISION AND ORDER OF THE COURT.
Dated: November 10, 2025
Bronx, New York
E. Deronn Bowen, A.J.S.C.

Footnotes

Footnote 1: Defendant voluntarily withdrew and waived all Mapp suppression claims prior to the start of the hearing.

Footnote 2:
 Of course, other evidentiary safeguards may prevent the statements' impeachment use at trial. The court determines here only that there exists no constitutional impediment to the People's use of the non-excepted statements for impeachment purposes.